**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

MOHAMMAD TAHIR and MUSLIM CENTER OF NEW JERSEY, INC. d/b/a MARLBORO MUSLIM CENTER,

Plaintiffs,

v.

TOWNSHIP OF MARLBORO ZONING BOARD OF ADJUSTMENT; TOWNSHIP OF MARLBORO, NEW JERSEY; JONATHAN HORNIK, in his individual capacity and official capacity as MAYOR of the TOWNSHIP OF MARLBORO; TOWNSHIP COUNCIL OF THE TOWNSHIP OF MARLBORO; MICHAEL MILMAN, ANTOINETTE DINUZZO and NICHOLAS STELLA, in their individual capacities and official capacities as COUNCIL MEMBERS OF THE TOWNSHIP OF MARLBORO

Defendants.

Civil Action No. 3:26-cv-12766

**COMPLAINT**

## LOCAL RULE 10.1: STATEMENT OF PARTY ADDRESSES

1. The mailing address of Plaintiff Mohammad Tahir ("Tahir") and the principal place of business of Plaintiff the Muslim Center of New Jersey, Inc. d/b/a Marlboro Muslim Center (the "Muslim Center") is 449 Tennent Road, Morganville, in Marlboro Township, New Jersey 07751, identified as Block 300, Lot 58 on the

Township's tax map (the "Property"). The mailing address of Defendants Township of Marlboro Zoning Board of Adjustment (the "Board"), the Township of Marlboro, New Jersey ("Township"), Jonathan Hornik in his individual capacity and official capacity as Mayor of the Township of Marlboro ("Mayor"), Township Council of the Township of Marlboro ("Council"), and Council Members Michael Milman, Antoinette DiNuzzo, and Nicholas Stella in their individual and official capacities (collectively, "Defendants") is 1979 Township Drive, Marlboro, New Jersey 07746.

## INTRODUCTION

2. Marlboro is home to a vibrant Muslim community. Since 2015, members of the community have gathered at various makeshift locations to hold Friday prayers, community events, and children's study sessions. While there are at least ten houses of worship for Marlboro's Christian, Jewish, and Hindu communities, the Muslim community has no permanent place for prayer and gathering because there are no mosques in the Township.

3. For over a decade, Plaintiffs have invested in and endeavored to develop a mosque for the Muslim community of Marlboro, without which they cannot practice the essential tenets of their faith.

4. Five years ago, Plaintiffs applied for permission to build a mosque in their town. The Township subjected Plaintiffs to a protracted, years-long application process fueled by anti-Muslim sentiment within the Township and perpetuated by

Defendants. Rather than a conventional land-use proceeding that is typically resolved within several months with little public attention, Plaintiffs' Application faced fierce, anti-Muslim opposition that dragged on through years of proceedings. Opponents of the mosque engaged in a campaign of public opposition that included disrupting hearings on the Application, threatening politicians if they did not oppose the mosque, and promoting anti-Muslim stereotypes that portrayed Muslims as dangerous, radicalized, and incompatible with the Township on social media and at hearings.

5. Defendants capitalized on the charged atmosphere and hateful rhetoric. Defendant Mayor and members of the Defendant Council openly campaigned on stopping the construction of the mosque in the months leading up to the primaries and elections in the Township, with no regard for the constitutional rights of Plaintiffs or the Township's Muslim residents.

6. Faced with political pressure from the Mayor and Council and anticipated backlash from the community, the Board tried to simply avoid the issue, repeatedly canceling and rescheduling hearings on the Application as a delay tactic that went on for years. Tahir ultimately filed an action in state court that compelled the Board to hold hearings on the Application and reach a decision, as it had been statutorily required to do all along.

7. Against this background, the Board—unsurprisingly—denied the Application, resting the denial on concerns about traffic, parking, and a lack of sufficient information. The Resolution memorializing the Board's denial relies on a series of supposed findings that are pretextual, flatly contradicted by the record, and inconsistent with the Board's own prior decisions. Indeed, the Board's decision flies in the face of approvals that it has granted to other houses of worship and secular institutions.

8. Congress enacted the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), expressly to protect the use, construction, and development of real property for religious exercise. The statute prohibits a government from imposing or implementing land-use regulations in a manner that substantially burdens religious exercise unless the government establishes a compelling governmental interest pursued through the least restrictive means. 42 U.S.C. § 2000cc(a)(1). The statute also separately prohibits discrimination against religious assemblies and institutions. *Id.* § 2000cc(b).

9. The Board's decision also rests on the Township's facially unconstitutional and discriminatory Land Use and Development Ordinance (the "Ordinance"), codified at Chapter 220 of the Municipal Code, under which houses of worship are not a permitted use as of right anywhere in the Township. In those districts where houses of worship are permitted, the Ordinance requires applicants

to obtain conditional use permits before properties can be used for that purpose, and the Ordinance further subjects houses of worship in residential districts to requirements that are more restrictive than those imposed on comparable secular uses. In other words, by making it harder to build a church, synagogue, or mosque than a restaurant or retail shop, the Township infringes on the sacred, constitutionally protected right to freely exercise one's religion.

10. Plaintiffs bring this action to challenge the substantial burden that Defendants have imposed on their exercise of their religion and Defendants' discriminatory and unequal treatment. In opposing the proposed mosque and ultimately denying the Application based on the Muslim community of Marlboro's religious practices, Defendants have violated Plaintiffs' federal and state constitutional and statutory rights, including their rights under RLUIPA, the First and Fourteenth Amendments to the United States Constitution, and the New Jersey Constitution. Accordingly, Plaintiffs seek declaratory, injunctive, and other relief to remedy Defendants' violation of their civil and constitutional rights.

## PARTIES

11. Tahir is a resident of Marlboro Township, the President of the Muslim Center, and the owner of the Property. Tahir sought approval to construct a house of worship, a mosque, for the Muslim Center and its congregants on the Property.

12. Plaintiff Muslim Center is a non-profit corporation and Muslim religious organization, founded by Muslim residents of Marlboro and incorporated in the State of New Jersey. Its mission is to create and maintain a permanent place for the Muslim community in Marlboro Township to engage in traditional Islamic worship. The Muslim Center seeks to participate in the construction and maintenance of the mosque proposed by Tahir on the Property for its congregants in furtherance of its mission. Absent the construction of the mosque, the Muslim Center's congregants have no permanent place to engage in traditional Islamic worship within Marlboro.

13. Defendant Board is the Township's Zoning Board of Adjustment, organized pursuant to N.J. Stat. Ann. § 40:55D-69, which has the jurisdiction and power to review certain development applications and grant variances pursuant to the Municipal Land Use Law, N.J. Stat. Ann. § 40:55D-1, *et seq.* ("MLUL").

14. Defendant Township is a municipal corporation located in Monmouth County, New Jersey.

15. Defendants Mayor and Council are, and at all times relevant hereto were, the duly elected Mayor and Council of Marlboro Township, Monmouth County, New Jersey. The Mayor and Council are responsible for enforcing Township ordinances, supervising Township departments and employees,

appointing municipal officers and employees where authorized, including to the Board, and acting under color of New Jersey law.

16. Defendants Councilman Michael Milman, Councilwoman Antoinette DiNuzzo, and Councilman Nicholas Stella are, and at all time relevant hereto were, members of the Council of Marlboro Township.

17. Each of the Defendants is a "government" within the meaning of RLUIPA, 42 U.S.C. § 2000cc-5(4)(A).

## JURISDICTION AND VENUE

18. Plaintiffs' federal claims arise under 42 U.S.C. § 2000cc, *et seq.* and 42 U.S.C. § 1983. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

19. This Court also has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from the same facts and circumstances as Plaintiffs' federal claims and are so related to those claims that they form part of the same case or controversy.

20. Venue properly lies in the District of New Jersey ("District") pursuant to 28 U.S.C. § 1391(b) because all the events giving rise to this action occurred in the Township of Marlboro, which is located within this District, and the Defendants are subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

### I. The Substantial Burdens on Plaintiffs' Religious Exercise

21. The mission of the Muslim Center is to create a permanent home and house of worship for Marlboro's Muslim community by building a mosque. A mosque bears particular spiritual significance in the Muslim faith. It is a purpose-built structure dedicated to practicing Islam where Muslims gather for daily prayers, known as *salat*, and a special congregational prayer every Friday at midday, known as *Jum'ah*.

22. *Salat* is one of the Five Pillars of Islam. It is a fundamental obligation of Muslim faith. Muslim doctrine requires adherents to turn toward the Holy City of Mecca and pray five times each day—at dawn, noon, mid-afternoon, sunset, and night. Likewise, *Jum'ah* is a fundamental obligation of Islam and is typically the most attended service of the week.

23. It is customary for Muslims to gather before *Jum'ah* at a mosque to recite additional prayer, attend recitation of the Qur'an, and engage in religious discussion and fellowship. The period following *Jum'ah* is traditionally a time for continued prayer, religious reflection, and community activity within the mosque.

24. In addition to daily prayers and *Jum'ah*, a mosque provides a place for congregants to gather for funeral prayers and other religious observances.

25. Muslims also gather at a mosque for religious study and youth education. An Imam associated with the mosque leads and provides spiritual guidance to the congregation.

26. The Muslim Center and its congregants believe they have a fundamental religious obligation to provide opportunities for congregants to deepen their and their children's understanding of the Islamic faith through group study and reflection on the Qur'an—the central religious text of Islam—and the teachings of the Prophet Muhammad. These opportunities are provided through the Imam associated with the mosque and communal gatherings at the mosque.

27. Mosques also contain important structural features to allow for religious practice consistent with Muslim beliefs. For example, because Muslim prayer is gender-separated, mosques include dedicated prayer areas and separate entrances for men and women.

28. In addition, Muslims must perform ablution, known as *wudu*, by ritually washing before prayer. Most mosques have dedicated facilities to allow congregants to perform *wudu* before prayer.

29. Muslims do not pray using pews or chairs, as are found in some other houses of worship. Muslim prayer involves standing, bowing, and prostration. Inside mosques, wall-to-wall carpeting with woven designs is often used to delineate individual prayer spaces.

30. Because there are no mosques in Marlboro Township, Marlboro's Muslim community, including Tahir and the Muslim Center's congregants, are unable to practice essential tenets of their faith, including daily congregational prayer and religious education.

31. In December 2020, Tahir—the President of the Muslim Center—purchased the Property in Marlboro.

32. Understanding the need for a permanent house of worship, Tahir and the Muslim Center intended to construct a mosque on the Property to provide members of the Marlboro Muslim community a sacred place to practice their Islamic faith in line with their beliefs, traditions, and practices.

33. The mosque that Plaintiffs propose on the Property would possess all of the above-listed facilities necessary to support Plaintiffs' practice of their religion.

34. Because there is no mosque in Marlboro, certain members of Marlboro's Muslim community have been meeting each week since January 2024 at the former Morganville Firehouse (the "Firehouse"). The Firehouse is located at 78 Tennent Road, Morganville, in Marlboro Township, New Jersey 07751. The Muslim Center rents the space from the Township each Friday for one hour from 1:00 PM to 2:00 PM to gather for *Jum'ah* prayer services.

35. During that brief one-hour period, Tahir and the Muslim Center's congregants must (1) prepare the facility for prayer by arranging prayer rugs, setting

up sound equipment and religious materials, and converting the space into a temporary prayer area; (2) conduct an abbreviated prayer service; and (3) restore the facility by dismantling the prayer area, removing all sound equipment and religious materials, and vacating the premises.

36. Because the space is rented for only an hour, congregants are unable to gather before services for the voluntary prayers, Qur'an recitation, religious discussion, and fellowship that are otherwise customary to designated mosques, and they are unable to remain after *Jum'ah* services for additional prayers, religious reflection, community-building activities, or other forms of religious exercise customarily associated with mosque attendance.

37. Furthermore, the facility is unable to properly accommodate female congregants. The facility lacks the separate entrances, dedicated prayer areas, and sufficient privacy accommodations required by Islam for female congregants. Thus, female congregants currently have no facility for communal prayer and very few attend any gatherings at the Firehouse.

38. The Firehouse also lacks dedicated or appropriate facilities for congregants to perform ablution (*wudu*) in line with Islamic practice.

39. The Muslim community's arrangement at the Firehouse—which only accommodates a subset of the community for an hour a week using makeshift facilities—is not a substitute for a mosque.

## II. The Property's Site Characteristics

40. The Property is a five-acre parcel located at 449 Tennent Road in the R-80 Residential District ("R-80 District") in Marlboro Township.

41. Currently, there is a single-family residence and garage on the Property, which Plaintiffs intend to remove to allow for construction of the mosque.

42. The Property and its borders are heavily-wooded.

43. The Property is wedge-shaped—with the narrower part of the wedge facing Tennent Road—and widens substantially as one moves from the road into the Property. **Figure 1** below is an image from Google Maps (2026 imagery) showing the approximate lot lines and location of the existing residence on the Property.




**Figure 1**

44. Under the Ordinance, Lot Frontage is the "horizontal distance of lot lines or portions thereof which are coexistent with a street line." Code § 220-4B.

45. Lot Width is the "horizontal distance between the side lot lines, measured along the required building setback line perpendicular to the lot depth." *Id.*

46. The Setback Line is a "line drawn parallel to a street line or lot line and drawn through the point of a building nearest to the street line or lot line." *Id.*

47. The Required Setback Line is "a line that is established a minimum horizontal distance from the street line or lot line and beyond which a building or part of a building is not permitted to extend toward the street or lot line." *Id.*

48. Along Tennent Road (the Lot Frontage), the Property is 59.71 feet wide. As part of his Application to build a mosque, Tahir agreed to dedicate a portion of the Property to expand the County right-of-way in front of the Property, which in turn increases the Property's Lot Frontage to 71.67 feet.

49. The Property's width at its widest point is about 455 feet. The Property's Lot Width—the point nearest the street where a structure may be built—is 104.15 feet wide.

50. The proposed mosque would be built much further back than the Property's Required Setback Line. Specifically, the front line of the proposed

mosque would be located at a point on the Property where the width is roughly 280 feet, and it would be set back approximately 266 feet from Tennent Road.

51. Tennent Road is a minor arterial road owned by Monmouth County and designated County Route 3. The speed limit is 40 miles per hour. According to New Jersey Department of Transportation data, in 2025 annual average daily traffic along the stretch of Tennent Road where the Property is located was 9,901 vehicles.

52. The section of Tennent Road in front of the Property is two lanes facing opposite directions and about 24 feet wide.

53. The County has an existing right-of-way for Tennent Road that is significantly wider than the road itself, measuring approximately 49.5 feet according to Marlboro Township's 2025 Tax Assessment Map.

54. A church (Robertsville Bible Church) is located less than half a mile away from the Property, at the corner of Tennent Road and Church Road.

55. The Firehouse, where the community currently meets for Friday prayer, is on Tennent Road roughly 3.5 miles away from the Property.

## III. The Zoning Conditions Marlboro Imposes on Houses of Worship

56. Houses of worship are not a permitted use as of right—meaning permitted without any special approval—anywhere in Marlboro Township. Marlboro's Ordinance instead classifies houses of worship only as a "conditional use."

57. A conditional use is "permitted at those locations in [a] zone where the use meets the conditions set forth in the zoning ordinance." *Coventry Square, Inc. v. Westwood Zoning Bd. of Adjustment*, 650 A.2d 340, 341 (N.J. 1994).

58. In the R-80 District, where the Property is located, houses of worship are considered a conditional use requiring a permit. Code § 220-48D(1). Only two uses are permitted as of right within that district: single-family dwellings and temporary buildings "for uses incidental to construction work." *Id.* § 220-48A.

59. In Marlboro, the conditions required for houses of worship to be permitted as a conditional use include the following:

- The property must be located along one of 35 enumerated roads, which include Tennent Road;
- The property must have a minimum lot area of 3.5 acres;
- One parking space must be provided for each three seats within the house of worship, or one parking space must be provided for each 72 inches of seating space when benches rather than seats are used;
- In residential zoning districts, the property's maximum lot impermeable development coverage cannot exceed 28%;
- The property must have a minimum Lot Frontage of 150 feet;
- In residential zoning districts, the property must have a minimum Lot Width of 150 feet; and
- In residential zoning districts, a 35-foot landscaped buffer must be provided to "any existing residential use."

*Id.* § 220-105A.

60. There is no landscaped buffer requirement for a building used by a "nonprofit organization which is primarily supported by charitable contributions" in residential districts (defined as an "eleemosynary use," per the Ordinance). *See id.* §§ 220-107, 220-4. "Commercial swimming pools" and "swimming clubs" in residential districts likewise have no landscaped buffer requirement. *See id.* §§ 220-113, 220-96. A "quasi-public" building, such as a "clubhouse," in a residential district requires only a "ten-foot-wide buffer strip, suitably landscaped . . . along the side and rear property lines." *Id.* § 220-112E.

61. The Ordinance expressly provides that landowners can build within required buffer areas "[s]uch driveways as are necessary to provide proper means of ingress and egress for the parking area" and "[d]irectional signs in conjunction with said driveways which are necessary for the proper guidance and control of vehicular traffic." *Id.* § 220-100B.

62. Not all of Marlboro's zoning districts permit houses of worship even as a conditional use. Houses of worship, for example, under the Ordinance cannot be built at all in the C-2 Neighborhood Commercial District, C-3 Community Commercial District, and LC Land Conservation District. *Id.* §§ 220-85, 220-86, 220-47. Farms, in contrast, are "a permitted use everywhere in the Township, regardless of zoning designations and regardless of whether specified as permitted uses therein." *Id.* § 220-36C.

63. The Ordinance prevents Plaintiffs from seeking to build a mosque in certain districts where secular assemblies are permitted because the Ordinance bars houses of worship outright from those same districts, and it imposes more onerous conditions on houses of worship than on secular uses in residential zones where houses of worship are allowed as conditional uses.

**IV. The Muslim Center's Site Plan and Variance Application**

64. On September 17, 2021, Tahir submitted the Application to the Board for site plan approval and certain variances to build a mosque on the Property.

65. On January 3, 2022, the Application was deemed complete by the Board engineer and planner.

66. The Property meets the conditions for conditional use as a house of worship within the R-80 District, except with respect to minimum Lot Frontage and Lot Width.

67. The Ordinance anticipates a minimum of 150 feet of Lot Frontage and Lot Width, whereas the Property has 71.67 feet of Frontage, and its Lot Width (i.e., the width at the Required Setback Line) is 104.15 feet. Because of the Property's wedge shape, its Lot Frontage and Lot Width do not accurately reflect the site's overall size or capacity to support a house of worship and its congregants.

68. The Property's size and other characteristics make it a well-suited location for a house of worship, consistent with the Township's Ordinance allowing

such uses in the R-80 District. Because the proposed house of worship did not meet two of the Ordinance's conditional use standards—minimum Lot Frontage and Lot Width—Tahir sought a conditional use variance under N.J. Stat. Ann. § 40:55D-70(d)(3) (a "d(3)" variance).

69. In addition, Tahir's Application also sought a "c," or "bulk," variance under N.J. Stat. Ann. § 40:55D-70(c) to install industry-standard 9-by-18-foot parking spaces, which are slightly smaller than the Ordinance's required dimensions of 10-by-20 feet.[1]

70. Over the course of the application process, Tahir modified plans for the site several times in response to requests or input from the Board. The latest site plan, dated May 26, 2025, proposes a 13,127-square-foot two-story mosque with a prayer area for 264 congregants (which Tahir agreed would be the maximum occupancy limit), a parking lot with 107 spaces, separate entrances and areas for male and female congregants, and a decorative dome and minaret.

71. An overhead rendering of the final site plan is depicted below in **Figure 2**, which illustrates the proposed mosque building and parking lot.

[1] Tahir also sought "c" variances to allow the proposed mosque to (1) not have a loading area and (2) have a parking distance more than 150 feet from the mosque. The Board found that those variances could be properly granted and thus are not at issue here.




**Figure 2**

72. The plan also reflects a 35-foot landscaped buffer to adjacent residential properties. Only the site driveway and sign cross the buffer.

## V. The Community's Hostile, Anti-Muslim Opposition to the Application

73. Although the variances that Tahir sought were straightforward, and houses of worship are expressly allowed by the Ordinance as conditional uses within the R-80 District, the Application was met with intense hostility by members of the Marlboro community. An atmosphere of anti-Muslim animus pervaded the Application process.

74. Township residents took to social media to rally discriminatory opposition against Tahir's Application and Plaintiffs' intent to build a mosque on the Property. For example:

- On September 17, 2024, on the Marlboro NJ Residents Facebook page, in response to a post informing residents of an upcoming hearing for the proposed mosque, Nick Stella, now a member of the Council, replied: "Don't the people get a say. We don't want this in our town!"

- In a March 21, 2025 Facebook post on the Marlboro NJ Residents page regarding the proposed mosque, Christina Milkie Russotto, the Marlboro School Board President from January 2022 to January 2024, commented: "They have ruined this town. Might as well move to New York."

- Joseph Wyner replied to the same thread, stating: "Aren't they all radicalized in the mosques if they're not already radicals."

- Howard Vogel also replied "My main concern is if it is built and Israel has a flareup with one of its neighbors are we going to have anti Jewish rallies blocking Tennant road?"

- On an April 24, 2026 post on the Marlboro N.J. Happenings Facebook page informing residents of an upcoming hearing on the Application, Janice D'Anna replied: "It's a cel [sic]. They all are. Where do you think they are all coming from."

- Buffie Olvera-Weaver replied to the same post, stating: "We don't want a Muslim mosque in our neighborhoods, we don't need to end up like Minnesota."

- On April 25, 2026, Joe Fortunato replied to the same post, stating: "A violent religious cult with a culture of violence especially against jews which Marlboro has the majority of? Whose money grabbing traitorous idea was this. I've been posting for years about the Muslim 'plan.' . . . It's either convert or kill."

- On the same day, Bella Zaritsky replied to a similar post on the Marlboro NJ Community Facebook page stating: "A Mosque in one of the most highly Jewish populated area [sic] in all of central Jersey?? Are you kidding me? Even a thought of this is a huge slap in the face!!"

75. Stoked by such comments and anti-Muslim animus, opponents to the Application made their opinions known at town hearings. At least one hearing had to be canceled because an oversized and unruly crowd gathered to oppose the mosque. Board member JoAnn Denton had to intervene multiple times across the hearings in an attempt to cut off this behavior, reminding attendees, "We can't have clapping. We can't have booing, hissing, or anything." That behavior nonetheless continued.

76. During one hearing a member of the public questioned, "Does the mosque function like other houses of worship?" A member of the audience shouted: "No, it does not."

77. Hostile and inflammatory comments were also made directly to Tahir and his attorney over the course of the hearings. For example, during the April 28, 2026 hearing, an aggravated community member confronted Tahir's attorney, asking how she "sleeps at night." In reference to that comment, Board member Denton noted on the record "there was some inappropriate comment that made it to someone in this room during the break."

78. A photograph taken of mosque supporters attending the April 28, 2026 hearing was shared on the Marlboro NJ Residents Facebook page. The social media

post denigrated supporters of the mosque as "out-of-town visitors," and comments responding to the post reflected significant hostility toward the supporters and anti-Muslim sentiment:

- Resident Avery Brown's reply: "they believe in concepts like 'Jihad' . . . and it's not just Jews they hate . . . . i know a lot of you sit back and think, 'it doesn't affect you', but if you're not of their religion, you might want to think again!!!" He further commented, "I would urge anyone that who [sic] could, to come out and speak out against it."

- Resident Tim Tyler commented, "ever hear the saying not all Muslim's [sic] are terrorists but all terrorists are Muslim."

79. Defendants bowed to that political pressure. The Mayor and members of the Council capitalized on public hostility toward Plaintiffs' proposed mosque, aligning themselves with and amplifying those sentiments in their campaigning, with deliberate, reckless, or callous indifference to the impact these statements would have on Plaintiffs, their religious exercise, or the exercise of their constitutional rights.

80. For example, Councilman Nick Stella (author of the aforementioned September 17, 2024 Facebook post) released a campaign flyer referencing Plaintiffs' proposed mosque by asking, "Did you know that the town's planning board . . . [is] about to approve a new <u>20,000 ft. worship house on Tennent Road?</u>", and then pledging that a "vote for us is a vote to stop the development . . . ."

81. On April 25, 2025, in the comments section of a post on the Marlboro NJ Residents Page depicting his campaign flyer, Councilman Stella touted that the

Council "DOES appoint the members of the town zoning board, which does have the authority to outright reject proposed projects/buildings." His statement suggests that the Council possesses significant influence over the outcomes reached by the Board.

82. Social media commentary concerning the Application also included repeated efforts to influence the Board's consideration of the Application through political pressure, with commenters urging Defendants to deny the Application and threatening backlash at the polls for Township officials who did not prevent the mosque from moving forward:

- On April 29, 2026, in response to a Facebook post by the Mayor acknowledging hostility at the April 28, 2026 zoning hearing, resident Derek Borgersen posted a picture in the comments section reading: "ERASE ISLAM FROM THE USA."

- On April 28, 2026, on the Marlboro NJ Residents Page on Facebook, sitting Board of Education member Danielle Bellomo wrote: "Remember during election season when they said the mosque would never happen? Its [sic] time to hold elected officials to their campaign bullet points, and question why deputy mayors and councilpeople swore this project was never going to be allowed, yet here we are."

- In a reply to a post on the same page, resident Alex Waldman stated: "Everyone needs to remember this moment when the elections hit. Jonathan Hornik term [sic] also ends December of 2027. We all need to remember how this situation was handled when these people are up for re-election!!!"

83. In a meeting with Tahir and representatives of the Muslim Center, the Mayor confirmed that Marlboro residents opposed the development proposal for the

Property because it would bring a mosque to one of the Township's visible thoroughfares. On April 17, 2026, the Mayor told the Muslim Center that the "location off of Tennent is always going to be a problem" because of complaining neighbors and "because it's visible."

84. As a result of Defendants Mayor and Council's actions, Plaintiffs suffered injury, including, but not limited to, damages for the prolonged deprivation of a permanent place of worship, Plaintiffs' inability to freely exercise their religion, the costs incurred during the almost five-year pendency of the Application, and emotional distress from facing public backlash and denial of Tahir's Application that followed Defendants' statements of opposition to the proposed mosque.

85. Consideration of Tahir's Application also occurred against a broader backdrop of rising anti-Muslim sentiment and violence in New Jersey and nationwide.

86. In its 2025 Civil Rights Report, the Council on American-Islamic Relations recorded receiving a total of 8,658 complaints of incidents of Islamophobia, "the highest number ever recorded since the organization's first civil rights report in 1996." CAIR California, *CAIR's 2025 Civil Rights Report Reveals Alarming Trends in Islamophobia and Anti-Muslim Discrimination* (Mar. 11, 2025), https://ca.cair.com/press-release/cair-2025-civil-rights-report-reveals-alarming-trends-in-islamophobia-anti-muslim-discrimination.

87. Muslim Americans have recently been the targets of lethal violence. In May 2026, two gunmen attacked the Islamic Center of San Diego, killing three people. Cameron Pugh & Victoria Hoffman, *San Diego Mosque Shooting Comes Amid Anti-Muslim Spike. What Can Be Done?*, Christian Science Monitor (May 23, 2026), https://www.csmonitor.com/USA/Society/2026/0523/shooting-san-diego-mosque.

88. Marlboro's Muslim community has experienced this increased anti-Muslim hostility directly. Parents of children in Marlboro's public schools have reported that their children are bullied because they are Muslim.

89. Following the San Diego mosque shooting, the Muslim Center asked the Mayor to arrange for a police officer to be stationed at the Firehouse during Friday services. The Mayor ignored that request. The Muslim Center obtained a Friday police detail only after contacting the Marlboro Township Police Department.

90. In addition, for more than a decade, numerous New Jersey municipalities have attempted to unlawfully block the construction of mosques using delay and pretext in the zoning approval process. Those tactics closely mirror those that Defendants applied to Tahir's Application in the face of mounting community pressure.

91. For example, in 2010, Al Falah Center purchased property in Bridgewater Township to construct a mosque and applied to the local planning board

for approval. *Al Falah Ctr. v. Twp. of Bridgewater*, No. CV 11-2397 (MAS) (LHG), 2013 WL 12322637, at *1 (D.N.J. Sept. 30, 2013). Shortly thereafter, the plans were the subject of a news article, attracting a hostile response to the planned mosque development. *Id.* at *2. Planning board hearings on Al Falah's application attracted an "agitated and hostile" crowd numbering in the hundreds. *Id.*

92. On April 26, 2011, following denial of its application, Al Falah sued the township alleging violations of RLUIPA, the United States and New Jersey Constitutions, and New Jersey law. *See* Complaint, *Al Falah Ctr. v. Twp. of Bridgewater*, No. CV-11-2397 (MAS) (LHG) (D.N.J. April 26, 2011). In December 2014, the parties entered into a settlement agreement that required the township to purchase a $2.75 million property and pay Al Falah $5 million, and that allowed construction of a mosque and community center. Mike Deak, *Bridgewater, Mosque Settlement Reaches $7.75 Million*, My Central Jersey (Dec. 2, 2014), https://www.mycentraljersey.com/story/news/local/somerset-county/2014/12/02/bridgewater-mosque-reach-settlement-million-land-swap/19775661.

93. Similarly, in April 2012, the Islamic Society of Basking Ridge ("ISBR") applied to the Bernards Township planning board for preliminary and final site plan approval to build a mosque. *Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, 226 F. Supp. 3d 320, 325–27 (D.N.J. 2016). "ISBR's hearings before the

Planning Board commenced on August 7, 2012, and continued until the denial of ISBR's application on December 8, 2015—amounting to 39 hearings over a three-and-a-half year period, which is more than the Planning Board held for any previous applicant." *Id.* at 329. "[T]hroughout the process, the Planning Board and its professionals made a series of demands based on the Board's interpretations of the zoning ordinance that had never been applied to any other applicant in the Township." *Id.* The plaintiffs nonetheless "revised their site plan and brought back professionals to testify time and again, only to find that the Board had generated yet more requirements resulting from Plaintiffs' satisfaction of prior demands." *Id.*

94. In particular, the board in that case subjected ISBR's application to "unprecedented individualized inquiry" regarding its "off-street parking needs." *Id.* For "churches, auditoriums, and theaters" the town parking ordinance required one parking space for every three seats. *Id.* (citation modified). Before ISBR's application, the board routinely applied the 3:1 requirement "to every house of worship that applied for site plan approval," including churches and synagogues. *Id.* at 330. But for ISBR's application, the board voted to require "107 parking spaces" whereas according to the parking ordinance it would have only needed 50. *Id.* at 331–32. Even though ISBR tried to address the planning board's concerns by, among other things, offering to "split its weekly service into two separate services" to

"reduce the parking demand by half," the board denied ISBR's application outright in January 2016. *Id.* at 332–33.

95. In March 2016, ISBR sued the township in the District of New Jersey alleging violations of RLUIPA, the First, Fifth, and Fourteenth Amendments of the United States Constitution, and the New Jersey Constitution. *See id.* at 325. On ISBR's motion for partial summary judgment on the pleadings, the court held that the township had "unambiguously treated ISBR's application to build a Muslim mosque differently than applications for Christian churches and Jewish synagogues," violating RLUIPA's Nondiscrimination Provision. *Id.* at 351–52. In May 2017, the parties entered into a settlement agreement which included a $3.25 million settlement payment from the township and allowed construction of a mosque. Order, *Islamic Soc'y of Basking Ridge*, No. 16-CV-1369 (MAS) (LHG), 2017 WL 2900964 (D.N.J. May 30, 2017).

96. In 2023, Masjid Sadar applied to Sayreville's planning board to obtain the necessary approvals to build a mosque with capacity for 973 congregants. Complaint at 23–24, *Masjid Sadar, Inc. v. Borough of Sayreville*, No. 3:25-CV-17831 (MAS) (JTQ) (D.N.J. Nov. 21, 2025). The board held eight hearings on Sadar's application—more than any other application to the board in the prior five years. *Id.* at 28.

97. The issue of the amount of the mosque's off-street parking dominated the hearings. *Id.* at 29. Sadar proposed installing 107 parking spaces, which provided one space for every three prayer mats in the mosque's proposed prayer halls. *Id.* at 35. To assuage the board's parking capacity concerns, Sadar additionally agreed to condition approval on not celebrating major holidays at the property, and, when necessary, leasing additional parking from a nearby elementary school as was the community's existing practice. *Id.* at 31, 35.

98. In June 2025, the board denied Sadar's application. *Id.* at 2. Before voting, the board's members explained aloud that they believed the proposed mosque required a far greater number of parking spaces, determined not by the floor area of the prayer spaces or amount of seating, as is set by the applicable ordinance, but by the floor area of the entire building. *Id.* at 42.

99. In November 2025, Sadar sued Sayreville for violations of RLUIPA, the United States and New Jersey Constitutions, and New Jersey law. *Id.* at 64–69. The litigation is ongoing.

100. This backdrop of hateful statements of Marlboro residents, vehement opposition to the Application in response to those statements, pressure exerted on the Board by constituents and the other Defendants, and rising anti-Muslim sentiment nationwide and in New Jersey caused the Board's decision-making process to become overrun by anti-Muslim animus. Following the playbook

attempted by multiple other New Jersey municipalities before them, Defendants subjected Tahir's Application to unequal and discriminatory treatment, including elevated scrutiny and extraordinary delays.

## VI. The Board's Extraordinary Delays in Deciding the Application

101. Under New Jersey's Municipal Land Use Law, a zoning board ordinarily must render a decision on an application seeking a use variance within 120 days of the submission of a complete application. N.J. Stat. Ann. § 40:55D-73.

102. In Tahir's case, the Board did not render a decision on his application for almost ***five years*** and did so only after he filed litigation in state court seeking default approval of the Application based on the Board's failure to render a decision within the statutory deadline.

103. Over those almost five years, the Board scheduled sixteen public hearings regarding Tahir's Application. Most of those hearings were canceled at the last minute and delayed. Ultimately, six hearings were actually held, with the majority taking place only after a state court ordered the Board to hold hearings and issue a determination on Tahir's Application.

### A. The Board Delays Hearings on the Application for Years

104. The Board scheduled the Application to be heard for the first time at its April 11, 2023 hearing, more than 15 months after the Board's engineer deemed the Application complete.

105. However, the Board did not hear Tahir's application during the April 11, 2023 hearing. It instead carried the Application to its June 13, 2023 hearing.

106. The June 13, 2023 hearing was then rescheduled to December 12, 2023.

107. Tahir's Application was not heard at the Board's December 12, 2023 hearing and was again carried, this time to the March 26, 2024 public meeting, allegedly because the Board's agenda contained too many other applications and Tahir's Application was toward the end of the agenda.

108. On the day of the Board's March 26, 2024 hearing, Boris Vernovsky (the "Objector"), an objector to the Application who owns property on 323 Timber Hill Road, submitted a letter to the Board asserting that public notice of the rescheduled hearing was deficient, and so the Board once again carried Tahir's Application, this time to the May 28, 2024 hearing.

109. Before the May 28, 2024 hearing, Marlboro residents opposed to the mosque organized to attend. A substantial crowd gathered, but when attendees filed into the Marlboro Town Hall meeting room, space remained on the room's benches for additional members of the public.

110. Nonetheless, the Board refused to hear Tahir's Application, citing the room's capacity. When proponents of the mosque learned the Board was again going to defer consideration of the Application, they offered to leave the room to address

the Board's stated capacity concerns. The Board declined that offer and instead instructed a police officer to remove the attendees.

111. As attendees were escorted out, several opponents of the mosque yelled at Board members for allowing the Application to "drag on" and complaining of the purported "environmental effects" of the proposed development. After the room was cleared, the Board remained and took up the other matters on its agenda.

112. The Board next scheduled the Application to be heard on September 24, 2024 at the Marlboro Recreation Center, which could accommodate a larger crowd.

113. Since Tahir's experts attended the cancelled May 28, 2024 hearing in anticipation of testifying, Tahir incurred additional costs related to their attendance despite his Application not being heard and his experts not being permitted to provide testimony.

114. On September 24, 2024—more than two years and eight months after the Application was deemed complete—the Board held its first hearing on the Application.

115. During that first hearing, the Board's Chairman stated that he "ha[d] never seen anything like what happened" at the abortive May 28, 2024 hearing and warned that members of the public "are not allowed to just get up, yell, scream, and come up and approach our board members."

116. Tahir presented the testimony of two expert witnesses—Shrinath Kotdawala ("Kotdawala"), a civil engineer, and Malathi Ananthakrishnan ("Ananthakrishnan"), an architect.

117. Tahir's expert testimony did not conclude by the end of the meeting, so his Application was carried to the Board's December 10, 2024 hearing.

118. The Application was not heard at the December 10, 2024 hearing because the Board lacked a quorum. Tahir was not informed of this cancellation until that day.

119. The Application was carried to the March 11, 2025 hearing.

120. The Application was not heard at the March 11, 2025 hearing because the Marlboro Recreation Center was unavailable.

121. The Board rescheduled the hearing on the Application to April 8, 2025.

122. At the April 8, 2025 hearing, Tahir presented four witnesses—Kotdawala (the engineer who previously testified); Ananthakrishnan (the architect who previously testified); a specialist on the operation of mosques, Ibrahim Salman ("Salman"); and a traffic engineer, John Rea ("Rea").

123. Because their testimony did not conclude by the end of the hearing, the Application was carried to the Board's June 10, 2025 hearing.

124. The Application was not heard on June 10, 2025, which coincided with primary elections in Marlboro. Although Tahir had confirmed multiple times that

the hearing would go forward despite primary elections taking place that day, the Board ultimately canceled the hearing, citing the elections.

125. The Board rescheduled to hear the Application during a special hearing on June 24, 2025.

126. Against the backdrop of the primaries and local politicians' campaigns against the proposed mosque, it is apparent that the Board's repeated rescheduling was motivated by the efforts of Defendants and opponents of the Application to capitalize on hostility toward the mosque during the elections.

127. The Application was not heard on June 24, 2025. A day before the hearing, the Board canceled because it expected to lack a quorum. The Board rescheduled the hearing on the Application to September 30, 2025.

128. In a video uploaded on June 26, 2025, two days after the canceled hearing, to several Marlboro-focused Facebook pages (and deleted hours later), Councilman Michael Milman and Councilwoman Antoinette DiNuzzo, then running for reelection, publicly expressed that they "unequivocally" opposed Plaintiffs' proposed mosque.

129. On a post discussing the deletion of Councilman Milman and Councilwoman DiNuzzo's video, Councilman Stella likewise commented, "I've been on record against the Tennent Road structure and coordinating with citizen

coalitions fighting it from BEFORE the election. My opinion has never changed, I've never kept it a secret, and we cannot afford anything less."

130. During a Council meeting on July 17, 2025, a member of the public thanked Councilman Milman and Councilwoman DiNuzzo for "shar[ing] . . . publicly that they opposed" the mosque and indicated that he thought "they'll be rewarded publicly for that in November."

**B. Tahir Requests and Is Denied a Special Hearing**

131. On July 11, 2025, Tahir emailed the Board Secretary Suzanne Rubinstein ("Board Secretary") requesting that, in light of the repeated cancellations, a special hearing be scheduled on the Application before September 30, 2025.

132. The Board Secretary did not schedule an earlier special hearing. Instead, on July 23, 2025, she merely confirmed the Application would be heard at the September 30, 2025 meeting. She and Tahir also reserved December 9, 2025 to be used for a further hearing on the Application, if necessary to complete the testimony.

133. On September 12, 2025, the Board cancelled the upcoming September 30, 2025 hearing because it expected to lack a quorum.

134. The Board rescheduled the hearing on the Application to December 9, 2025.

### C. Tahir Files a State Court Lawsuit Seeking Default Approval of the Application

135. Under New Jersey law, failure of a zoning board to render a decision on a conditional use permit application within 120 days of the submission of a complete application "shall constitute a decision favorable to the applicant." N.J. Stat. Ann. § 40:55D-73(b).

136. In October 2025, Tahir began the process for seeking automatic approval of the Application, including by publishing notice in a local newspaper.

137. On October 24, 2025, Tahir filed a lawsuit against the Board in New Jersey state court seeking automatic approval of the application. The case was captioned *Mohammad Tahir v. Township of Marlboro Zoning Board of Adjustment et al.*, No. MON-L-003846-25 (N.J. Super., October 24, 2025).

138. On December 9, 2025, the Board heard Tahir's Application over his objection that the state court action deprived the Board of jurisdiction, without public notice by the applicant as required under N.J. Stat. Ann. § 40:55D-12, and without Tahir or any of his representatives present at the hearing.

139. On January 13, 2026, the Objector moved to intervene in the state court action.

140. On January 13, 2026, Tahir moved for summary judgment.

141. On March 26, 2026, New Jersey Superior Court Judge Scott Arnette entered a Consent Order remanding the matter to the Board and requiring the Board

to schedule special hearing dates to complete testimony on the Application and to vote on the Application no later than July 14, 2026.

142. The Board later certified its compliance with the terms of the Consent Order in a letter to the state court dated August 12, 2026, indicating that it had held the required hearings and had voted on the Application in advance of the July 14, 2026 deadline.

**D. The Board Holds Court-Ordered Special Hearings**

143. Following entry of the Consent Order, the Board held four special hearings on the following dates: April 28, 2026; May 5, 2026; May 12, 2026; and June 23, 2026.

144. At the April 28, 2026 hearing, Tahir presented the continued testimony of Kotdawala (the civil engineer) and Rea (the traffic engineer), as well as the testimony of Usman Zubair ("Zubair"), a board member of the Muslim Center, regarding the operations of the anticipated mosque. Counsel for the Objector cross-examined Kotdawala, Rea, Zubair, and Ananthakrishnan (the architect who previously testified at the September 24, 2024 hearing).

145. At the May 5, 2026 hearing, Tahir presented the testimony of Christine Nazarro-Cofone ("Cofone"), a planning expert, regarding the Application's compliance with conditional use requirements.

146. At the May 12, 2026 hearing, the Objector presented testimony from an engineer, Ryan Krueger; a wetlands scientist, Emile DeVito; and a planner, Carlos Rodrigues. The Board's planner, Laura Neumann ("Neumann"), ended the meeting by listing information that she claimed was supposedly missing from the Application.

147. At the June 23, 2026 hearing, the Board presented the testimony of its traffic expert, Kevin Chen, and heard comment by Board Attorney Kelly Carey. Members of the public commented on the Application, and the parties presented closing arguments.

148. At each of the last four hearings leading to the denial of Tahir's Application, witnesses gave extensive testimony. Nevertheless, members of the Board and the Board's consulting staff, including Neumann (the Board's engineer and planner), Kevin Chen (the Board's traffic engineer), and Ryan MacNeill (the Board's alternate planner), hardly asked questions of the witnesses or commented on their review of the Application.

## VII. The Testimony Presented at the Six Hearings

149. Testimony presented at the hearings demonstrated that the Property could accommodate the mosque and the Muslim Center's congregation. Over the course of the hearings, Tahir's expert witnesses submitted and supplemented their reports in response to the Board's comments and provided testimony regarding the

same. Public comments from supporters of the mosque also highlighted the inherent benefit of the mosque to the Township.

### A. Lot Width, Lot Frontage, and Traffic Impacts

150. Tahir presented multiple expert witnesses' testimony in support of a variance from the minimum Lot Width and Lot Frontage requirements.

151. Tahir's first expert witness, Kotdawala, has been a land use engineer in New Jersey since 1995 and obtained his professional license in 1998. The Board accepted Kotdawala's qualifications as a professional engineer.

152. Kotdawala testified that the Property has "more area than [the] minimum required for this particular project." He stated: "If you propose any non-residential use and [in] particular[,] [a] house of worship, three and a half acre[s] is minimum required lot size, while our subject site is five acres."

153. Kotdawala further explained that, although the Property's Lot Frontage is 59.71 feet, Tahir agreed to dedicate a portion of the Property to expand the County's right-of-way in front of the Property if the Application were granted, widening the Lot Frontage to 71.67 feet.

154. Tahir's planning witness, Cofone, has been a licensed professional planner in New Jersey for 30 years. Cofone testified that she has been "qualified in Marlboro on many occasions as well as [by] hundreds of other planning and zoning boards throughout the State of New Jersey." Cofone teaches planning and zoning

courses at Rutgers University. The Board accepted Cofone's qualifications as a planner.

155. Cofone explained why the Property was "still an appropriate location for the site," notwithstanding the Lot Frontage being under 150 feet. She described the Property as "a very irregularly shaped lot," but "as you get further away from Tennent Road, [the] lot gets significantly wider and that's why that lot frontage variance condition is actually improved over the existing condition due to the right[-]of[-]way dedication." According to Cofone, "at [the Property's] widest point, this lot is 455 feet." Cofone explained that "[w]hile there are some modifications and prior relief requested with respect to the [lot] width and frontage, this is an extremely large site and far larger than what is contemplated for a house of worship. . . . I see a complete lack of substantial detriment if in fact the [B]oard were to move favorably on the two deviations. . . ."

156. Cofone further testified that the zoning ordinance provides that any house of worship "shall have direct access to one of the following streets: . . . Tennent Road, County Route 3." Cofone, referring to Code § 220-105A(5), explained that the Township's "conditional use requirements specifically call for Tennent Road to be a location for a house of worship."

157. Tahir's traffic expert, Rea, is a licensed professional engineer in New Jersey. He has 50 years' experience in the traffic engineering field. Rea earned a

Bachelor's degree in civil engineering from the New Jersey Institute of Technology and a Master's degree in transportation engineering from New York University. Rea testified that he has "appeared before [the] [B]oard on numerous occasions." The Board accepted Rea's qualifications as a traffic expert.

158. Rea testified that he "d[id]n't think the driveway [at the entrance of the Property] would be designed much differently" even if the Property had the Lot Frontage anticipated by the Ordinance. He conducted a "service analysis" showing that ingress and egress of the maximum anticipated current and future volume of mosque attendees could be accommodated at the site driveway, taking into account roadway traffic and peak traffic conditions at the mosque. Rea based his service analysis on estimated site generated traffic using data published by the Institute of Transportation Engineers (ITE) on churches, as well as traffic counts at the Firehouse.

159. Rea further testified that the proposed mosque would have "minimal" impact on traffic on Tennent Road. He presented findings from two traffic impact studies that he conducted, which were based on traffic counts along Tennent Road near the Property from June 2023 and May 2025 and at the Firehouse at 78 Tennent Road from the fall of 2024 and May 2025.

160. Rea observed traffic counts along Tennent Road near the Property on days when schools were open and at peak morning and afternoon drop-off and pick-up times to ensure he had a representative sample of data.

161. Rea observed traffic counts at the Firehouse on Friday afternoons, which he described as "the peak hours for parking and for traffic for a mosque" due to Friday afternoon prayer services.

162. Rea ultimately concluded that "the traffic volumes on [the Firehouse's] section of Ten[ne]nt Road are higher than the traffic volumes . . . at 449 Ten[ne]nt Road. And traffic was able to enter and exit the site safely and efficiently." He further opined that, from 1:00 PM to 2:00 PM on Friday afternoons during Friday afternoon prayer services, while traffic counts at the Firehouse reached 985 vehicles, traffic counts near the Property only reached 565 vehicles. When a member of the public questioned Rea whether "the traffic you see now going in and out of the [F]irehouse is reflective of what we will see when we build this full[-]fledged mosque," Rea responded that "there's going to be . . . a 10 percent increase in traffic . . . . There's going to be a redistribution of traffic somewhat. It's not going to be significant[.]"

163. Rea also testified that outside of Friday afternoons, "[t]he rest of the week . . . the prayers that are being held [are expected to] have minimal attendance, 10, 15, 20 people." Based on his fall 2024 traffic counts at the Firehouse, Rea testified that even on Friday afternoons, "there was not a concentrated flow of traffic

in for the beginning of the service and a concentrated flow of traffic out." Based on his updated May 2025 traffic counts at the Firehouse, Rea further testified that congregants "arrive over the course of the hour. Some people in at 1 o'clock, some people at 1:10, some people at 1:15."

164. Rea further testified that Tahir was coordinating with the Monmouth County Planning Board—which has jurisdiction over Tennent Road—to arrange for the installation of a left turn lane to help further facilitate the flow of traffic into the site.

165. To the extent the Board had concerns that traffic would affect Tennent Road, Plaintiffs also agreed to a number of conditions to address those concerns.

166. First, Tahir agreed to provide a traffic control officer from the police department. Rea stated that doing so "is the safest and most efficient way to get traffic onto and off the site during Friday afternoon prayer services."

167. Second, Tahir agreed to limit the maximum occupancy of the mosque to 264 persons.

168. Third, the Muslim Center agreed to provide parking lot attendants and a volunteer at the entrance of the mosque to monitor the capacity of the parking lot and ensure that the mosque's occupancy limit was not violated. Cars that would result in overcapacity would not be permitted to enter the site.

**B. Parking Spaces**

169. Tahir also presented three expert witnesses' unrebutted testimony in support of the minor variance seeking to provide 9-by-18-foot parking spaces rather than 10-by-20-foot spaces.

170. Kotdawala explained that 9-by-18-foot parking spaces comply with American Association of State Highway and Transportation Officials (AASHTO) standards. Kotdawala added that 9-by-18 feet "is enough size for most cars to handle it" and that "all the projects [he has] designed . . . are using 9-by-18."

171. Rea likewise testified that the smaller parking space size would be appropriate for uses like the proposed mosque:

> Generally speaking, a 9-foot wide, 18-foot deep parking stall is adequate for a house of worship. You don't usually have large items being carried into and out of the church, the mosque, the synagogue. It's a different situation for a Home Depot, Lowe's Costco, where you have large boxes, product, shopping carts, things of that nature, then you always, you know, would recommend a 10-foot wide parking stall.

172. Rea further testified, "The 9x18 parking stall is the standard size parking stall" and cited other houses of worship in Freehold Township and Manasquan with 9-by-18 feet parking spaces.

173. Cofone testified that, in her experience, the requested variance for 9-by-18-foot parking spaces "is something that has been [sic] in conjunction with other house of worship applications" in Marlboro and is "classified as a minor variance."

174. Indeed, even the Objector's planner agreed that "9 by 18 is the industry standard" and requiring 10-by-20-feet spaces "doesn't really resonate" with him.

### C. Operations and Attendance

175. Tahir also presented testimony explaining how mosques typically operate and the anticipated operations of the proposed mosque specifically.

176. Salman testified that he had more than ten years' experience working with non-profit organizations in the Islamic faith throughout New Jersey and had visited hundreds of mosques in New Jersey and across the United States. Despite this extensive experience, the Board declined to accept Salman as an expert, citing a lack of professional licensure.

177. According to Salman, prayer services at mosques are usually no longer than 15 minutes. Daily prayer times usually have "low turnout," and turnout is higher during Friday afternoon prayers and the month of Ramadan. He explained that, at the temporary Firehouse location, Friday prayers do not "get more than 60, 70 people."

178. When members of the Board asked whether it was possible that the congregation of the proposed mosque would grow to 1,000 people, Salman responded that he "anticipate[d] that the mosque is going to grow one percent, two percent, per year, but [he didn't] see anywhere near those numbers being in the building at the same time."

179. Members of the Board asked Salman other questions that they recognized were outside of Salman's knowledge, including questions relating to traffic and specific questions about the specific operations anticipated at the proposed mosque. When Salman suggested at one point that the mosque might not close until 10:30 p.m., the Board's Chairman, Michael Shapiro, suggested that would result in "people . . . still lingering around, hanging out, socially speaking, hanging out on the patio" and "cause[] problems."

180. Subsequently, Zubair provided supplemental fact testimony as a member of the congregation responsible for overseeing operations of the proposed mosque.

181. Zubair clarified how operations at the proposed mosque specifically would be conducted. Zubair explained that "designated personnel" and "designated management" would monitor capacity at the Property, and that only 100–120 congregants were expected to attend services during Ramadan (a peak time).

182. Zubair also clarified in his testimony the timing of night prayers. When the southerly neighbor to the Property asked at a hearing whether the mosque's operations would be "all night long," Zubair responded that "in the winter months we will be shutting off as early as 8:30" and "in the summer months, as late as 10:35." Zubair explained that the mosque would be shut down "10 minutes after the last prayer" and offered as a condition that "we will not be open past 11:00 p.m."

Tahir also provided the below timetable of prayer times (Figure 3) in a "Statement of Operations" provided to the Board:

<table>
<tr><th colspan="7">Prayer Service Schedule (Marlboro)<br>Daily Prayer Service Duration: 10-15 minutes</th></tr>
<tr><th colspan="2"></th><th>Prayer 1 (Dawn) *</th><th>Prayer 2 (Noon)<br><<except on Fridays>></th><th>Prayer 3 (Afternoon)</th><th>Prayer 4 (Sunset)</th><th>Prayer 5 (Night) **<br><<except during month of Ramadan>></th></tr>
<tr><td rowspan="12">Daily Prayers</td><td>January</td><td>6:30 AM<br>(ends 6:45 AM)</td><td rowspan="12">1:15 PM<br>(ends 1:30 PM)</td><td>3:00 PM<br>(ends 3:10 PM)</td><td rowspan="12">starts 10 minutes after sunset<br>(duration=10 minutes)</td><td rowspan="2">8:00 PM<br>(ends 8:15 PM)</td></tr>
<tr><td>February</td><td rowspan="2">6:00 AM<br>(ends 6:15 AM)</td><td>3:30 PM<br>(ends 3:40 PM)</td></tr>
<tr><td>March</td><td rowspan="7">5:30 PM<br>(ends 5:40 PM)</td><td>8:45 PM<br>(ends 9:00 PM)</td></tr>
<tr><td>April</td><td>5:15 AM<br>(ends 5:30 AM)</td><td>9:30 PM<br>(ends 9:45 PM)</td></tr>
<tr><td>May</td><td rowspan="4">5:00 AM<br>(ends 5:15 AM)</td><td>10:00 PM<br>(ends 10:15 PM)</td></tr>
<tr><td>June</td><td>10:10 PM<br>(ends 10:25 PM)</td></tr>
<tr><td>July</td><td>10:10 PM<br>(ends 10:25 PM)</td></tr>
<tr><td>August</td><td>9:45 PM<br>(ends 10:00 PM)</td></tr>
<tr><td>September</td><td>6:00 AM<br>(ends 6:15 AM)</td><td>9:00 PM<br>(ends 9:15 PM)</td></tr>
<tr><td>October</td><td>6:30 AM<br>(ends 6:45 AM)</td><td>4:30 PM<br>(ends 4:40 PM)</td><td rowspan="3">8:00 PM<br>(ends 8:15 PM)</td></tr>
<tr><td>November</td><td>6:00 AM<br>(ends 6:15 AM)</td><td rowspan="2">3:00 PM<br>(ends 3:10 PM)</td></tr>
<tr><td>December</td><td>6:30 AM<br>(ends 6:45 AM)</td></tr>
<tr><td>"Noon" Prayer on Fridays</td><td>All Year</td><td>-</td><td>1:15 PM<br>(ends 1:45 PM)</td><td>-</td><td>-</td><td>-</td></tr>
<tr><td>The Month of Ramadan</td><td>Feb 7 to Mar 8 (2027)</td><td colspan="4">Refer to the Daily Prayers schedule above</td><td>8:00 PM<br>(ends 9:30 PM)</td></tr>
</table>

* Prayer times shift throughout the year based on sunrise and sunset. The Dawn prayer time shown represents the earliest possible start time for that month.
** The Night prayer time shown represents the latest possible start time for that month.

**Figure 3**

## D. Public Comments on the Need for a Mosque

183. During the public comment period at the final June 23, 2026 hearing, members of Marlboro's Muslim community spoke about their community's need for a permanent house of worship.

184. One member of the community spoke about the particularly heavy burden placed on women and children:

> [The Firehouse] is a makeshift arrangement. The firehouse is an empty hall with limited privacy for women. No dedicated separate entrance, no way for women to feel comfortable, which is important to many of us as part of our faith.
>
> Because of that, many women in our community simply don't come. They stay home. Not because they don't want to pray with the community, but because the space does not accommodate them. As a mother, I can tell you that the firehouse is not a place you want to bring your children.
>
> There is no appropriate space for kids, no area where you can tend to a child during Ramadan, especially when families are coming together for evening prayers. Women often stay home because the experience of the firehouse is not workable. The floors are hard and cold, and uncomfortable. There is nothing set up for families.

185. The same member of the community also said the absence of a mosque has caused the community to lack a sense of belonging:

> [At the Firehouse] [t]here's no sense of home, no sense of belonging. . . . And for a community trying to practice its faith, that is not dignified and not sustainable. Every other faith community in Marlboro has a permanent home. Some have more than one.
>
> Multiple churches, multiple synagogues, a temple. The Muslim community of Marlboro has zero. We are the only faith community in this township that has no place of our own. All we are asking for is what every other faith community already has, a dignified, permanent place to pray, to gather as families, and to call our own.

186. Another young Muslim community member echoed the same sentiment:

> I have met so many amazing people here in Marlboro that I love contributing to the society with. And precisely because I have grown up here, I have also grown up with the privilege of having so many friends from so many different backgrounds, cultures and faiths.

> But one thing I always noticed was that many of my friends had a place where they could connect . . . and share their freedoms and values. They have youth programs, community events, and a place that felt truly theirs. . . .
>
> I'm part of the community here. Yet I never truly felt like I belonged here. There was always a crucial part of my identity that felt disconnected because there was no space for it here in the town I call home.

187. Another Muslim community member spoke about the positive contributions the community had already made to the Township, and the additional contributions that would be facilitated by constructing a mosque:

> There are many Muslim families across Marlboro whose sons and daughters are doing exactly what I did volunteering for the first aid squads, EMS, fire companies, and community organizations. . . . [Marlboro's Muslim residents] are answering calls, staffing ambulances, and helping their neighbors in emergencies alongside neighbors of every faith and background. . . . [A]ll that volunteering and community service, is happening without a permanent home. The Muslim community in Marlboro has no mosque.
>
> We have no facility, no storage space for food bank donations, no meeting space to organize volunteer efforts, and no central location to coordinate community service. We are doing all of this out of our own homes . . . and through personal initiatives. . . .
>
> [E]very other faith community in Marlboro uses their house of worship as a hub for community service. They run food drives out of these facilities. They host blood drives. They organize charitable programs and partner with local organizations. . . . [T]his is what houses of worship do. A mosque will do no less.

188. These speakers were not alone. Numerous other members of Marlboro's Muslim community likewise described, in similar terms, the substantial

burden imposed on their exercise of religion by the absence of a permanent house of worship, the contributions of the Muslim community, and the community's need for a mosque.

**E. The Testimony of the Board's Professionals**

189. As noted above, before the Board voted to deny Tahir's Application, it heard presentations by its own professionals. While it is not unusual for the Board to hear testimony by its own professionals, the testimony of the Board's professionals here was unusual in that it focused on the site plan for the Application supposedly being incomplete—despite the Board having deemed the Application complete *years* earlier.

190. The Board's planner, Laura Neumann, ended the May 12, 2026 hearing by listing various information that she claimed was missing from the Application. This list was unexpected, as Neumann had already provided seven rounds of comments on the Application over the course of the hearings that Tahir had responded to. Yet she had never previously raised these concerns. Among other things, she claimed that the Application did not include enough information regarding Tahir's plan for a left-turn lane on Tennent Road, how safe egress/ingress would be maintained if the mosque reached maximum capacity, "utilities" for the site, septic system capacity, how many congregants would be attending services, or anticipated tree removal. The Board did not ask her any questions, and Tahir was

not given an opportunity to question her about this supposedly missing information. None of these concerns were previously raised. Neumann did not attend the June 23, 2026 hearing.

191. At the June 23, 2026 hearing, the Board's traffic expert, Kevin Chen, testified that the Application satisfied the Ordinance's off-street parking requirement: "[T]he parking requirement is 80 parking spaces based on one parking space for three seats . . . as per the township ordinance. . . . [T]he applicant's testimony was that 107 parking spaces are proposed." Chen acknowledged that Tahir had agreed to "make available a second [Friday] service if the first service reached capacity" to address parking-capacity concerns.

192. Chen also testified that "the [C]ounty has requested a left-turn lane to be installed at Tennent Road for the site" and acknowledged that Tahir's experts "testified that they are seeking approval for the left turn lane on Tennent Road" from Monmouth County.

193. Nonetheless, Chen claimed that the site plan was incomplete because it did not depict a left turn lane and that "[w]e are unable at this time to evaluate how the site ingress and egress circulation would be affected if the Tennent Road left turn lane [were constructed]."

194. Board Attorney Kelly Carey asserted that the site plan "doesn't comply with the [35]-foot buffer requirement on each side," but made no mention of the

Ordinance provision that expressly allows driveways and directional signs to be located within buffer areas.

## VIII. The Application Revisions and Conditions

195. In a good faith effort to address the Board's comments on the Application, Tahir agreed to numerous conditions and revised the site plan and architectural plans multiple times over the course of the hearings.

196. In addition to those conditions discussed above, Tahir also revised the location and shape of the proposed parking lot, increased the number of parking spaces to be provided which were still in compliance with the zoning law, reduced the height of the mosque's minaret, and agreed to contract a traffic control officer from the police department.

197. He further agreed to prohibit calls to prayer using any outdoor speakers or the minaret to reduce noise concerns and install professional blackout shades to address neighbors' concerns about disturbance by vehicle headlights. He offered to install a six-foot fence to screen the Property from neighboring properties—an offer that the Board declined.

198. Each time that Tahir revised the site plan or architectural plan in response to the Board's comments, Tahir incurred substantial additional costs, including the costs of having his experts prepare the submissions and the costs of resubmission to the Board.

## IX. The Board's Faulty and Pretextual Denial of the Application

199. At the close of the June 23, 2026 hearing, the Board voted to deny Tahir's Application.

200. On June 24, 2026, a day following the Board's denial of Tahir's Application, unlike they had done for any other routine zoning application, the Township's elected officials endorsed and publicly celebrated the denial, validating the discriminatory public opposition expressed during the hearings before the Board. For example:

- The Mayor publicly announced via an open letter to the Marlboro community on Facebook that he "agree[s] with the Zoning Board's denial of the application, as the proposed use was not an appropriate fit for the property."

- That same day, Deputy Mayor Juned Qazi republished the Mayor's statement on Facebook and further endorsed the denial by stating: "This is an excellent message from Mayor Jon Hornik regarding the recent decision by our Zoning Board members."

- The Council likewise aligned itself with the Board's action. Council President Antoinette DiNuzzo published a letter on behalf of the Township Council expressly stating that the Council wished "to express our full support for the Zoning Board's decision to deny the application for a mosque on Tennent Road."

201. New Jersey law requires a zoning board to issue a written "memorializing resolution" including "findings of fact and conclusions based thereon in each decision on any application for development" "not later than 45 days

after the date of the meeting at which" the board "voted to grant or deny approval." N.J. Stat. Ann. § 40:55D-10(g).

202. On August 11, 2026, the Board issued a memorializing resolution (the "Resolution") denying Tahir's Application. *See* Exhibit A. The Resolution was published on the Township's website on August 12, 2026. The Resolution is riddled with errors, conclusions, and reasoning that are disconnected from the testimony presented, turn on speculation rather than evidence, and are incongruous with the Board's treatment of similar applications.

203. In denying the conditional use variance for Lot Frontage and Width requirements, the Board speculated—with no evidence—that the community attending religious services at the mosque would dramatically grow and willfully violate occupancy limits for the mosque, creating traffic backups into the street, and disturbing neighbors. The Board claimed its concerns were rooted in the absence of a left-turn lane on Tennent Road—a road controlled by Monmouth County. But rather than conditioning approval of the Application upon approval of a left turn lane from the County Planning Board, as Defendants regularly do, the Board denied the requested variance outright.

204. The Board further stated that its denial was based in part on Tahir's failure to make the showing required for a variance from the Township's 35-foot landscaped "buffer" requirement at the front of the property, claiming the Property

is unable to meet that requirement due to its 25-foot-wide driveway. But in doing so, the Board ignored the provision of its own Ordinance that provides that driveways are permitted within buffer areas, as well as the conditions that Tahir offered, and agreed upon, to limit noise and light to neighboring properties. *See* Code § 220-100B.

205. In denying Tahir's request for a parking-space-size variance, the Board also ignored the uncontroverted evidence presented at the hearings that the 9-by-18-foot parking spaces he proposed are the industry standard and suitable for the proposed use. Its denial of that variance also stands in contrast to identical variances Defendants have granted without fanfare.

206. Finally, despite having deemed the Application complete years earlier, the Board denied site plan approval on grounds that the Application was missing information on issues like traffic patterns and the proposed septic system, which the Board has no jurisdiction over and had not requested additional information about during the years that it was considering the Application.

207. As a result of the Board's pretextual scrutiny and ultimate denial of Tahir's Application, and the protracted five-year process that came with it, Plaintiffs suffered from injury, including, but not limited to, damages for the prolonged deprivation of a permanent place of worship, Plaintiffs' inability to freely exercise

their religion, the costs incurred during the almost five-year pendency of the Application, and emotional distress.

### A. The Board's Conclusions Rest on Unfounded Assumptions About the Anticipated Future Growth of the Mosque's Congregation

208. The Resolution repeatedly cites anticipated future growth of the mosque's congregation as a reason the Property supposedly cannot accommodate the requested variances. But the Board's assumption that the congregation would grow exponentially is entirely baseless and rooted solely in speculation.

209. The Resolution dismissed the fact that Tahir had agreed to a maximum occupancy of 264 congregants as a condition of using the Property as a house of worship, which directly addressed the Board's supposed concern. Rather, the Board chose to assume instead—with zero supporting evidence—that the maximum occupancy limit would likely be violated.

210. Citing the Board's own expert, the Resolution states that "the Applicant could not provide the number of congregants and that has made it difficult for the Board to determine if the size is appropriate or if it will be able to accommodate anticipated future growth." The Resolution speculates that "[o]nce a new dedicated space is available the Board expects the congregation to grow quickly, and without membership records or requirements the Applicant had no way to quantify the potential for growth." In their questions during the hearings, multiple Board

members speculated—without any basis—that attendance at the mosque might "balloon" to 1,000 attendees.

211. The Board's findings ignore testimony that showed the mosque's anticipated congregation is nowhere close to the unprecedented number of congregants multiple members of the Board speculated that the mosque would have during the hearings.

212. Salman testified that he had seen no more than 60 to 70 congregants at the Firehouse. He also observed: "The one thing I would say is currently as an attendee once a month, so far I see that the attendance is actually below average compared to other mosques."

213. Zubair testified that at Ramadan prayer services—during which they would expect peak attendance—the Muslim Center anticipated 100 to 120 congregants at the mosque.

214. This testimony was uncontroverted by any witness with knowledge of the prayer service attendance at the Firehouse or the Muslim Center's statement of operations.

215. The Board's findings also ignored Kotdawala's and Ananthakrishnan's testimony regarding how the number of prayer spaces that could fit on the main level and mezzanine level informed the Muslim Center's maximum occupancy. As Ananthakrishnan explained: "worship is from the floor and very often in a kneeling

position. So a little bit more room is required for each, each congregant. So we have assumed the 15 square foot per person space. . . . So this total square feet of 7,700 square feet, has an occupancy of 270 persons," excluding walkways and aisleways "on all four sides and anything in between." Ananthakrishnan later clarified that 176 prayer mats on the main level and 88 prayer mats on the mezzanine level would accommodate 264 persons.

216. The Board's findings also ignored public comment directly addressing the supposition that the mosque could hold over 1,000 people as well. A congregant, Raafay Tahir, added during public comment:

> Now I also want to address a claim that has been circulating that this building could somehow hold over 1,400 people. That number has been repeated on social media and in public comments, and I want to explain where it's coming from and why it is completely wrong.
>
> The way that number is being calculated is by taking the total square footage of the building, including the basement, which is the storage area and will not be used for prayer, and dividing that entire space by an arbitrary 15 square feet per person. That is not how houses of worship work.
>
> A house of worship is not a warehouse where you stack people like boxes of (inaudible) wall to wall. Houses of worship have lobbies; they have restrooms, they have hallways, bookshelves, a library, office spaces. There is a certain layout and design to a house of worship that serves its purpose and its community. And that requires space.

217. Raafay Tahir continued to cite three other houses of worship in Marlboro with thousands of square feet and under 200 parking spaces correlating with occupancy. He further explained:

> The formula that is being applied to this application . . . has never been applied to any other house of worship in Marlboro because it does not reflect reality.
>
> The proposed house of worship has 107 parking spots. That parking size is accommodated for the actual congregation, not a fictional capacity derived by dividing square footage by an arbitrary number. I would ask that this claim be given the w[eight] it deserves, which is none.

218. The Board's questions also ignored earlier testimony about the actual number of congregants the Muslim Center has seen at its prayer services at the Firehouse.

### B. The Board Failed to Properly Analyze the *Sica* Factors with Respect to the Conditional Use Variance for Lot Frontage and Width

219. Tahir requested a "d(3)" variance from the Ordinance's conditional use standards requiring houses of worship in residential districts to be located on lots with a minimum Lot Frontage and Lot Width of 150 feet.

220. Under N.J. Stat. Ann. § 40:55D-70(d), an applicant must satisfy certain "positive" and "negative criteria" to receive a d(3) variance. The positive criteria require a showing of the "special reasons" that make the variance appropriate, while the negative criteria require a showing the variance "can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." *Id.* The applicant must also show "that the site will accommodate the problems associated with the use even

though the proposal does not comply with the conditions the ordinance established to address those problems." *Coventry Square*, 650 A.2d at 347.

221. New Jersey law recognizes a house of worship as an "inherently beneficial" land use. *House of Fire Christian Church v. Zoning Bd. of Adjustment of City of Clifton*, 879 A.2d 1212, 1217 (N.J. App. Div. 2005).

222. For a variance to accommodate an inherently beneficial land use, the New Jersey Supreme Court has established a four-part test (the "*Sica* test") "as a general guide to municipal boards when balancing the positive and negative criteria." *Sica v. Bd. of Adjustment of Twp. of Wall*, 603 A.2d 30, 37 (N.J. 1992), *as modified by Monarch Communities, LLC v. Twp. of Montville*, 359 A.3d 373, 382 (N.J. 2026). The first step requires a board to identify the public interest at stake; this is the positive criteria component of the test. Applications for inherently beneficial uses are "regarded as having satisfied the positive criteria." *Children's Inst. v. Verona Twp. Bd. of Adjustment*, 675 A.2d 1151, 1153 (N.J. App. Div. 1996). The second step requires the board to identify the detrimental effect that will ensue from the grant of the variance. The third step requires the board to consider whether it may reduce the detrimental effect by imposing reasonable conditions on the use. The fourth step requires the board to determine whether the applicant has made a showing that the variance will not substantially impair the intent and the purpose of the zoning plan and zoning ordinance; this is the negative criteria component of the

test. If the applicant has made such a showing, the board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.

223. The conditional use variance from the Ordinance's Lot Frontage and Lot Width requirements called for the Board to consider the four steps of the *Sica* test. The Board's analysis of the variance was flawed at nearly every step.

224. At Step One, the Board did correctly acknowledge—as it must under New Jersey precedent—"the Applicant's proposal for a mosque as an inherently beneficial use and the Board has approved other temples and religious uses in recent years, although at different locations." Exhibit A, Resolution at 27.

225. The Board did not acknowledge, however, that the public interest at stake included Marlboro's Muslim community's need for a permanent house of worship, and that absent a grant of the Application, the community would continue to lack a place to practice central tenets of its faith. The Board also gave no credit to the testimony of members of the public describing the beneficial effects a mosque would bring to the community. The Board's step one analysis was therefore incomplete.

226. At Step Two, the Resolution states that the "detrimental effects" from the Property's "lack of frontage and width" is "the inability to establish safe access"

to the site because Tennent Road lacks a left-turn lane into the Property's driveway. Exhibit A, Resolution at 28.

227. But there is no necessary link between the Property's frontage and the installation of a left-turn lane on Tennent Road.

228. Tahir had submitted an application to Monmouth County's Planning Board to widen the roadway in front of the Property to support safe traffic flow. At first Tahir's engineer proposed adding a bypass lane. When the County responded to that application, it instead recommended installing a left-turn lane based on anticipated traffic volumes.

229. Tahir's engineer, John Rea, assured the Board and members of the public that Tahir was coordinating with the County to install a left-turn lane on Tennent Road:

- "[W]e're going to have a left-turn lane that the county is going to require us to put in.";
- "[W]e are mitigating our driveway by putting a left-turn lane in . . . .";
- "MR. REA: The county has asked for [the left-turn lane]. It's going to be a condition of approval from the county. [SPEAKER:] So they are going to approve? MR. REA: Yes. Oh, yes. Yeah.";

  "The left-turn lane is probably going to be about 100 feet in length. And then the tapers, it depends on the speed limit. The county is going to dictate what we have to do."
- "[I]n order to develop the left-turn lane, there will be some widening both north and south of the driveway in order to develop the left-turn lane. Yes."

- "[SPEAKER:] My question is, you said 100 feet turn — left turn, right? MR. REA: That's — I'm saying that's what I think the county will probably require. But it could be 125, could be 150. Whatever the county is going to look at the projected traffic volumes and the opposing traffic on Tenant [sic] Road and figure that out and tell us what they want."

230. The ability to install a left-turn lane does not depend on the Property's Lot Frontage. At the May 12, 2026 Board meeting, the Objector's engineer testified that the "minimum pavement width" required to accommodate a left-turn lane would be 42 feet. He also noted that the existing right-of-way width in front of the Property is 49.5 feet. Thus, the existing right-of-way in front of the Property is wide enough to accommodate a left-turn lane after road improvements.

231. As the Board correctly recognized in the Resolution, the County is "responsible for addressing any existing traffic issues and issuing any roadway permits." Exhibit A, Resolution at 28. If the Board had a good-faith concern about site access from Tennent Road, it could have conditioned variance approval on Tahir's coordination with the County on traffic flow on Tennent Road—as it has done in countless other instances.

232. Indeed, the Ordinance anticipates such conditional approval:

> Where County Planning Board review or approval is required on a . . . site plan, the approving authority shall condition any approval it grants upon either timely receipt or a favorable report by the County Planning Board due to its failure to submit a report within the required time period. If the county's report is negative or attaches conditions, the original action by the Township approving authority shall be null and

> void, and at the next regular meeting a new resolution shall be adopted which considers the County Planning Board's report unless an extension of time is granted by the applicant.

Code § 220-28A.

233. The Board and the Township Planning Board routinely grant such conditional approvals.

234. In 2008, for example, the Planning Board granted conditional site plan approval to the Hindu American Temple and Cultural Center (the "HATCC," or the "Temple"). One of the 105 conditions of approval was "obtain[ing] all other required approvals" from the "Monmouth County Planning Board." Resolution PB 981-07 at 17.

235. In 2017, Sunset Park, LLC applied to the Board to construct an assisted living facility in a zoning district where that use is not permitted at all. Resolution ZB17-6608 at 1, 4. One of nine conditions of approval required the applicant to "provide proof of the receipt of all outside agency permits and approvals necessary to develop the site as presented." *Id.* at 12.

236. In 2020, the Planning Board granted site plan approval to the Church in Marlboro (the "Church"). One condition of approval was that the Church's application would still be subject to "agency approval[]" by the "Monmouth County Planning Board." Resolution PB 1193-19 at 10.

237. In 2022, the Board granted variance relief and conditional site plan approval to Arctic Air Conditioning and Heating to build a warehouse complex. One condition of approval included that the "Applicant shall review the impact on the intersection of Texas Road and Spring Valley Road and shall work with the Board professionals to determine a safer circulation of the intersection." Resolution ZB 22-6789 at 16.

238. Instead of granting Tahir's Application with a condition of approval requiring coordination with Monmouth County regarding traffic flow on Tennent Road, the Board denied Tahir's Application outright.

239. During its analysis of Step Two of the *Sica* test, the Resolution also discusses the site plan's purported noncompliance with the 35-foot landscaped buffer requirement. Exhibit A, Resolution at 28–29. However, the Board's analysis of the Application's compliance with that requirement was also flawed, including because it failed to address the express terms of the Township's Ordinance allowing driveways within buffer areas.

240. As to Step Three, the Resolution states that "the biggest issue in this case is something that cannot be fixed with a condition. The lot needs more frontage, no condition can make the lot wider or give it more street frontage." Exhibit A, Resolution at 29. But the assertion that the "lot needs more frontage"—supposedly

to accommodate a left turn lane to allow for safe site access—is factually incorrect for the reasons discussed above.

241. Furthermore, the Board's conclusion that the supposed detrimental effect from the proposed use "cannot be fixed with a condition" is false because the Board was free to condition approval on Tahir's coordination with the County to address the left turn lane, as it has done repeatedly in past.

242. The Board's statement also stands in contrast to its reasoning in a recent application where it granted relief from a minimum lot frontage requirement. In March 2025, the Board approved an application to build a Wawa gas station and convenience store, which required variances from, among other things, minimum frontage, minimum width, and driveway setback requirements. Resolution ZB 24-6840 at 4–6. The resolution described the lot as "irregular" in shape, "having a narrow frontage but a long depth." *Id.* at 17. In granting the conditional use variance, the Board found the application "satisfied the positive criteria" in part because "the irregular shape of the subject Property and the substantial wetlands encumbrances [were] the driving force behind the [n]on-compliance." *Id.* at 21.

243. In discussing Step Three, the Resolution also minimizes the other discretionary use conditions Tahir agreed to accept, including a prohibition on holding weddings and special events and a prohibition on cooking on the premises. The Resolution states "the Board was skeptical as to the true reason for this list (to

cite the number 26 [conditions] in any legal argument in the future) and did not view this list as addressing the negative impacts of the d(3) variances required." Exhibit A, Resolution at 29.

244. The Ordinance does not require these use conditions, and many other houses of worship in Marlboro routinely hold weddings, special events, and cook food on their premises. Tahir cited these conditions because the Board would have required the mosque to adopt them.

245. At Step Four, the Resolution wrongly concludes that Tahir's "proposal would pose a substantial impairment to the purpose and intent" of the zoning plan and zoning ordinance. Exhibit A, Resolution at 33.

246. But the record shows that Tahir's Application satisfied the "showing" required by Step Four of the test. The Township's zoning plan contemplates houses of worship being located in the R-80 District alongside residential uses, and along Tennent Road specifically. Indeed, a church sits less than half a mile from the Property on the same road.

247. Granting the requested conditional use variance for Lot Frontage and Width would not "substantially impair" the intent and purpose of the zoning plan or Ordinance. As Cofone, Tahir's planning expert, testified, the Property is an appropriate site for a mosque, notwithstanding its Lot Frontage and Width, because it "gets significantly wider" farther from Tennent Road.

248. And Tahir's site plan accommodated the Property's irregular shape, and the Ordinance's Setback and Lot Width requirements, by placing the proposed mosque well behind the Required Setback Line. The Board additionally heard repeatedly that Tahir was working with the County Planning Board to coordinate improvements and address any traffic concerns on Tennent Road.

249. The proposed use was consistent with uses by houses of worship in residential zones as anticipated in the Ordinance. If the conditional use variance Tahir requested could be said to impair the zoning plan or Ordinance at all (which they cannot), that impairment would be at most insubstantial.

250. At Step Four, the Board also failed to appropriately "weigh the positive and negative criteria to determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good." *Monarch*, 359 A.3d at 385. New Jersey courts have recognized that "a non-residential use in a residential zone will produce some adverse effect, but a minimal adverse impact may not outweigh the positive criteria resulting from an inherently beneficial use." *Children's Inst.*, 675 A.2d at 1153. Further, some detrimental effects, such as an "increase in traffic" or "some tendency to impair residential character, utility or value," will usually accompany "any non-residential use in a residential zone." *Sica*, 603 A.2d at 37. But "[w]hen minimal," these effects "need not outweigh an inherently beneficial use that satisfies the positive criteria." *Id.*

251. While the Resolution goes to lengths describing the negative criteria, its Step Four analysis does not weigh them against the positive criteria at all. If the Board had done so, it would have had to acknowledge that granting the conditional use variance for Lot Frontage and Width to enable building a mosque on the Property would alleviate the ongoing substantial burden on the religious exercise of Marlboro's Muslim community—which currently has no place to practice the essential tenets of their faith—and brought substantial benefits to the greater community by enabling free practice of religion among community members and allowing for the community service and charity provided by the mosque congregants.

252. Without engaging in the required analysis, the Board erroneously concluded that "on balance, the grant of the" requested d(3) variance "would cause a substantial detriment to the public good." *Monarch*, 359 A.3d at 385.

253. In short, other than recognizing the proposed mosque is an "inherently beneficial use," the Board analysis of the *Sica* elements was flawed at every step and wholly unsupported by the record. The Board's purported explanations were nothing more than a pretext to attempt to justify the Board's predetermined and discriminatory denial of the Application.

### C. The Board's Analysis of the Buffer Requirement Was Legally Wrong and Ignored Tahir's Agreed-To Conditions

254. The Resolution also claims that the Application violates the Ordinance's 35-foot landscaped buffer requirement for houses of worship.

255. The Resolution asserts:

> For all sites within a residential zoning district there shall be provided a thirty-five-foot landscaped buffer to any existing residential use or zone in accordance with the design standards of the Township of Marlboro. A 35-foot buffer is not provided to the pre-existing residential neighbors on either side near the front of the site. The driveway and utility connections will be within the required buffer. Two buffers require 70 feet of width and that only leaves 1.7 feet for the 25-foot-wide driveway, therefore it will necessarily violate the residential landscaped buffer as well as the utility connections and monument sign. Code Section 220-105A(8).

Exhibit A, Resolution at 1–2.

256. That finding is factually and legally erroneous.

257. At the April 28, 2026 hearing, the Board heard testimony from Kotdawala on the mosque's compliance with the buffering requirement:

> Q: Did you revise the site plans to include a landscape buffer?
> A: Yes, we did.
> Q: Can you indicate what size that buffer is?
> A: It's 35 feet as required by the regulations.
> Q: So that's consistent with ordinance Section 220-105A8?
> A: Correct.

258. Per the site plans, only the mosque's driveway and sign cross the buffer.

259. The Ordinance expressly permits "driveways" and "directional signs" to cross landscaped buffer areas "as are necessary to provide proper means of ingress

and egress for the parking area" and to provide "proper guidance and control of vehicular traffic." Code § 220-100B.

260. The Board erred in including the Property's driveway in analyzing the buffer requirement.

261. Indeed, Defendants have recognized and applied an identical ordinance provision to the application of at least one other house of worship, finding that the driveways are permitted within buffer areas. In 2008, the Planning Board approved the site plan application of the HATCC, subject to 105 conditions. Condition 51 noted that one of the Temple's planned driveways crossed a buffer area:

> In accordance with § 84-66.A.(8) regarding places of worship, there shall be a 35 foot landscape buffer to any existing residential use or zone. A portion of the access drive on the northern side of the proposed temple encroaches on this buffer. It is noted that § 84-101.C allows access drives within said buffer. The property to the right of the site's main entrance shall be adequately buffered, as required by the Board Engineer.

Resolution PB 981-07 at 13–14.

262. The Township also has allowed site utilities to be constructed in buffer areas. In 2020, the Planning Board approved the site plan application of the Church in Marlboro. The resolution on that application reflects that the Church's site plan violated the landscaped buffer requirement. The resolution notes that "onsite grading area and drainage improvements are proposed within [the] required landscape buffer areas to residential properties along the side property lines." Resolution PB 1193-19

at 2–3. There, the Planning Board granted the requested variance from the landscaped buffer requirement. *Id*. at 9.

263. The Resolution on Tahir's application further finds that a "significant landscaped buffer is needed to provide sound attenuation and buffering from noise and headlights as members enter and exit in the predawn hours and late into the evening." Exhibit A, Resolution at 29.

264. In addition to erring in its analysis of the buffer already provided on the site, this finding also ignores the conditions that Tahir agreed specifically to address such concerns. Tahir offered to build a six-foot fence for the privacy of the mosque and its neighbors and to screen vehicle headlights (an offer which the Board refused) and agreed to install special parking lot lighting fixtures with back-shielding to prevent light spillage onto adjacent lots.

265. As Tahir's engineer, Kotdawala, explained:

> [W]e are proposing a six-feet-high board-on-board fence to avoid any headlights, which is spilling the light on the neighbors. So on top of the evergreen trees[,] that six feet board-on-board fence will prevent kind of like headlight light pollution to the neighboring properties. And then we talk about the lighting here. By the rule they require that the parking lot is illuminated for safety reason as well as like visibility. So we try always to put a back shield so that the light does not spill into the neighboring properties. And the same of the design we have made here, we assure that we will provide a back shield . . . .

266. The Township has previously accepted comparable screening or buffering measures as adequate for other houses of worship.

267. For example, in 2008 one of the 105 conditions of approval imposed on the HATCC included placing "adequate landscaping on the property, including a board-on-board fence to prevent any headlight intrusion from the parking lot into nearby residences." Resolution PB 981-07 at 10.

268. The Board disregarded both the Ordinance's provision allowing driveways in buffer areas and the conditions that Tahir offered to mitigate noise and light to neighboring properties. The Board's finding related to the buffer further demonstrates that the Resolution's reasoning for denying the Application was nothing more than pretext.

### D. The Board Disregarded the Evidence, Industry Standards, and Its Own Precedents in Denying the Parking Space Size Variance

269. Tahir also applied for a "c(2) variance" to paint industry-standard 9-by-18-foot spaces in its parking lot, rather than 10-by-20-feet spaces required by the Ordinance.

270. N.J. Stat. Ann. § 40:55D-70(c)(2) permits variances from a bulk-related zoning provision such as this if the requested deviation would advance the purposes of the MLUL and "the benefits of the deviation would substantially outweigh any detriment." A c(2) variance application must also satisfy the same "negative criteria" as a d(3) application—i.e., "that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent

and the purpose of the zone plan and zoning ordinance." *Monarch*, 359 A.3d at 381 (quoting N.J. Stat. Ann. § 40:55D-70).

271. In denying Tahir's application for a variance from the parking space size requirement, the Board claimed that Tahir had "not demonstrated that the requested relief from the parking stall size can be granted without substantial detriment to the public good" and that allowing the mosque to install 9-by-18 foot spaces would "substantially impair[] the intent and purpose of [the] zone plan." Exhibit A, Resolution at 38–39.

272. Those conclusions were at odds with the testimony presented at the hearings on the Application and Defendants' own routine grants of identical variances for 9-by-18-foot parking spaces in Marlboro.

273. All of the testimony at the hearing was in accord that 9-by-18-foot parking spaces would be safe and appropriate for the proposed mosque. Tahir's land use engineer, traffic engineer, and planner all agreed that those dimensions were the industry standard size for parking spaces and would meet the needs of congregants attending the mosque.

274. Even the Objector's planning expert agreed that 9-by-18-foot parking spaces are "the industry standard" and that he took no issue with that proposed variance.

275. Previous Board and Planning Board resolutions show that both Township bodies routinely grant variances to install 9-by-18-foot parking spaces in Marlboro as a matter of course.

276. For example, in May 2022, Marlboro's Planning Board approved a variance to paint 9-by-18-foot parking spaces in the parking lot of a proposed two-story office building. The memorializing resolution contained no discussion of the rationale for the variance, further affirming that the Board routinely grants such relief as a matter of course. *See* Resolution PB 1227-21.

277. In October 2021, the Board approved an application to carry out modifications to an existing synagogue, the Center for Jewish Life. The modifications involved reducing the size of the synagogue's parking lot. The Board's memorializing resolution for the Center for Jewish Life noted the presence of 9-by-18-foot parking spaces was an existing "non-compliant condition[]" on the property, but the Board raised no concerns about that condition and approved the application. Resolution ZB 21-6752 at 4–5.

278. Despite the Board's precedents and the undisputed testimony that 9-by-18-foot spaces are the industry standard, the Resolution purports to describe detriments that would follow if the Board were to issue the variance to the mosque:

> [T]he Board finds that the undersized stalls will create conflict in the parking lot, make it more difficult for cars to enter and exist [sic] spaces and make accidents and backups more likely. That increased noise,

> potential police response from accidents, and resulting traffic backups will spill off site and impact the neighbors.

279. That finding is not supported by any of the testimony the Board heard over the six meetings in which it considered Tahir's application.

280. Instead, the finding is based on the Board's speculation and unfounded assumptions. Chairwoman Denton stated as follows, in addressing the requested variance:

> The applicant's engineer (inaudible);he made a very – what I considered a very unsubstantiated statement on April 8th, 2025. . . . he said that he was proposing this smaller parking space because in his opinion, cars are getting smaller. But he gave no background for that, no study that confirmed that in – my view, in Marlboro, I think cars are getting bigger. At least I see a lot more SUVs, vans everywhere I go. So that concerned me that that was why he was proposing smaller spaces.

281. Chairwoman Denton's stated basis for rejecting the parking-space variance was her own anecdotal observation of vehicle sizes in Marlboro, notwithstanding the uncontroverted testimony of four witnesses that 9-by-18-foot spaces are suitable for houses of worship and this particular site.

282. Given the undisputed testimony at the hearings that the proposed parking space size posed no such concerns and the fact that the Board routinely grants identical variances, the Board's finding here can only be understood as pretextual.

### E. The Board Claimed Ignorance of Other Analogous Instances Where It Granted Variances

283. In the Resolution, the Board claims that it is unfamiliar with other nonconforming houses of worship in Marlboro where variance relief was granted. That is not only contradicted by recent Board resolutions involving other houses of worship, but also not an appropriate basis for denial, as zoning boards of adjustment are presumed to be familiar with their communities under New Jersey law.

284. In its analysis for Step Four of the *Sica* test, the Board did acknowledge that members of the public "argued that there are houses of worship on smaller lots, with less parking, in town." Exhibit A, Resolution at 31.

285. The Resolution however, dismisses these comments, stating those community members "did not provide any testimony on how long those [houses of worship] have been at th[ose] site[s] or if there were problems associated with those deficiencies." Exhibit A, Resolution at 31.

286. But those community members' comments were accurate: there are houses of worship in Marlboro on smaller lots with less parking. The Resolution's dismissal of those comments—which the Board itself was in the best position to verify—reflects the results-oriented approach that the Board took to consideration of the Application.

287. Under New Jersey law, the Board is presumed familiar with the other houses of worship in Marlboro. The New Jersey Supreme Court recognizes that

zoning boards of adjustment have "peculiar knowledge of local conditions." *Kramer v. Bd. of Adjustment*, 212 A.2d 153, 169 (N.J. 1965). Those bodies are deemed "thoroughly familiar with their community's characteristics." *Ward v. Scott*, 105 A.2d 851, 855 (N.J. 1954).

288. In October 2021, the Board approved the application of the Center for Jewish Life to expand an existing noncompliant use by building an extension to a structure and reducing the size of the Center's parking lot. The existing noncompliant conditions included the following:

- <u>Minimum required lot frontage</u>: The minimum required lot frontage was 400 feet, and the existing lot frontage was 305.6 feet;

- <u>Minimum required lot width</u>: The minimum required lot width was 400 feet, and the existing lot width was 305.6 feet;

- <u>Parking space size</u>: The Ordinance required parking spaces to measure not less than 10 by 20, feet and the "existing parking spaces measure[d] 9 feet by 18 feet."

- <u>Landscaped buffering and screening requirements</u>: The Ordinance required parking areas abutting residential uses to be "set back a minimum of 25 feet from the lot line and adequately buffered and screened from such use with planting or fencing," and the "existing parking stalls [were] set back approximately 15 feet from the southern property line and 12 feet from the northern property line, both of which abut residential uses.";

- <u>Minimum required lot area</u>: The minimum required lot area was 5 acres, and the existing lot area was 3.40 acres;

- <u>Minimum required lot depth</u>: The minimum required lot depth was 500 feet and the existing lot depth was 455 feet; and

- Minimum yard setbacks: The minimum required side yard setback was 75 feet, and the proposed setback was 49.6 feet.

Resolution ZB 21-6752 at 4–6.

289. As is true of Tahir's Property, "[p]roperties to the north and south of the [Center for Jewish Life] contain[ed] single family dwellings." *Id.* at 3.

290. The Center for Jewish Life's application was far more nonconforming than Tahir's Application. It required variances from 14 separate bulk and conditional use requirements—all of which the Board granted. *Id.* at 4–6.

291. Michael Shapiro was Chairman of the Board at the time it considered the application of the Center for Jewish Life. *Id.* at 11. Shapiro was a member of the Board present at five of the six hearings during which it heard testimony on Tahir's application. At two of those hearings, he presided as Chairman.

292. The Board resolution granting the application of the Center for Jewish Life does not articulate any specific concerns associated with the site's violations of the lot frontage, lot width, landscaped buffering, and parking space size requirements.

293. In stark contrast, the Board subjected Tahir's nearly-identical requested variances to extreme scrutiny.

### F. The Board's Denied Site Plan Approval Based on Missing Information that It Never Requested and on Matters Outside Its Jurisdiction

294. The Board denied Tahir's application for preliminary and final site plan approval on the grounds that:

> [N]ot enough information was provided to make a determination on site plan; tree replacement, buffering and the impact of utilities in the deficient buffer, provision of adequate septic service, safe access, parking and circulation due to limited lot frontage and width, occupancy standards, ingress and egress per County Requirements.

Exhibit A, Resolution at 41.

295. Defendants have not treated the site plans of other houses of worship and secular development projects with the same skepticism and scrutiny it applied to Tahir's Application. Rather than outright denial, Defendants have requested that applicants provide additional information, have conditioned approval on submission of additional information, or have conditioned approval on coordination with other governmental agencies. *See* N.J. Stat. Ann § 40:55D-22b. (requiring municipal agencies to "condition its approval" of an "application for development" "upon the subsequent approval" of outside agencies).

296. <u>The HATCC Application</u>: In 2008, the HATCC applied to the Planning Board for preliminary and final site plan and conditional use approval to construct a multi-purpose building housing a temple, dining hall, and classrooms. The Planning

Board granted site plan approval and a conditional use permit subject to 105 conditions. Resolution PB 981-07 at 10–18.

297. Those conditions reflected the Planning Board's lingering uncertainty about issues such as parking, tree placement, the environmental effects of the development, and building capacity. For example, Condition 1 indicates the Planning Board was uncertain about traffic volumes and circulation at the site, and the size of the Temple's congregation. It thus provided as follows:

> The applicant will use every means necessary to control traffic in and around its site. If needed, the applicant will hire police to control traffic on special days of services. The applicant, in conjunction with Township professional, shall monitor the site for a period of 12 months to determine whether or not more parking spaces are needed, and if needed, applicant will construct more spaces. If parking reaches 80%, the additional parking will be built in two phases as 80% is reached for each phase. The applicant [shall] place "No Parking" signs where its property fronts both Wooleytown Road and Texas Road.

Resolution PB 981-07 at 10.

298. Conditions 77 through 80 indicate that the Temple's tree removal and replacement plan was incomplete, requiring supplemental testimony. For example, Condition 77 states:

> The applicant shall testify how this project will maximize the retention of the existing natural features, such as trees, shrubs, brooks, drainage channels and view, in accordance with § 84-30.D.1.c.

Resolution PB 981-07 at 15.

299. Conditions 14, 15, and 63–73 demonstrate the Temple's stormwater plans lacked certain details the Planning Board required in order to approve the application. Condition 63, for example, states:

> The applicant's engineer shall certify to the storm water impacts of the proposed project on the adjacent properties, i.e., that there will be no impact.

Resolution PB 981-07 at 11, 14–15.

300. <u>The Sunset Park Application:</u> In 2018, the Board granted bifurcated-use variance relief to permit the development of Sunset Park, an assisted living facility, in a zoning district where the use was not permitted at all. Resolution ZB17-6608 at 1.

301. At the time the Board approved the application, the applicant had not presented a required environmental review. One condition of approval stipulated that the "Applicant agrees to submit environmental Phase I Report (i.e., Preliminary Assessment Report)." *Id.* at 12.

302. The applicant additionally had not obtained required approvals from outside agencies. Another condition of approval therefore required the applicant to "provide proof of the receipt of all outside agency permits and approval necessary to develop the site as presented in the testimony, plans and drawings submitted to this Board with this application." *Id.*

303. At the time the Board approved the application, it had "not yet seen a fully engineered site plan." *Id.* at 11. The Board therefore conditioned approval on the applicant "return[ing] to this Board for preliminary and final site plan approval . . . 50 days prior to starting any improvements on the Property." *Id.* at 12.

304. The Church in Marlboro Application: In 2020, the Planning Board granted preliminary and final site plan approval to the Church in Marlboro to construct a house of worship in the R-80 District containing a 220-seat sanctuary, meeting rooms, offices, a multi-purpose room, a kitchen, and a parking lot for 78 vehicles. Resolution PB-1193-19 at 1, 10.

305. Rather than denying the Church's application because of unresolved engineering, drainage, traffic, fencing, and landscaping uncertainties, the Planning Board imposed conditions of approval requiring the Church to comply with future engineering comments, obtain outside agency approvals, and follow fencing and stormwater requirements and all recommendations of the Planning Board's professionals. *Id.* 9–10.

306. The Planning Board's resolution also notes that the Church "agreed to work" with the owner of a neighboring property "on the placement of the drainage basin on the property and drainage overall," indicating that issue was not resolved at the time of approval. *Id.* at 5. In addition, a condition of approval required the Church to draft plans for "emergency access to the site, using a path with a gate, to be

reviewed by Township Engineer/Planner, Laura Neumann, PE, PP." *Id.* at 9. Another condition stated the Church's application would still be subject to "agency approval[]" by the "Monmouth County Planning Board." *Id.* at 10.

307. The Wawa Application: In March 2025, the Board approved the application of Marlboro 9 Developers, LLC to construct a Wawa market and fueling station. Resolution ZB 24-6840 at 4. The application required extensive variance relief, including variances from minimum frontage, minimum lot width, driveway setback, paved area setback, yard setback, building height, and landscaping requirements. *Id.* at 4–6.

308. The Board approved the application even though certain information was missing and the site plan still required modification. One condition of approval included requiring the applicant to provide a "cross-access easement agreement and maintenance plan subject to review and approval by the Board Attorney." *Id.* at 25. Another required the site plans to be modified in accordance "with all recommendations contained in the reports of the Board's Professionals." *Id.* The resolution also notes that the application was further subject to "all other applicable rules, regulations, ordinances, and statutes of the . . . County of Monmouth, State of New Jersey or any other jurisdiction." *Id.*

309. Defendants' approval of development applications with extensive conditions addressing missing or incomplete information shows that Defendants

routinely grant approval even where open questions remain about the details of a project.

310. The Board's choice to deny Tahir's site plan application outright due to supposedly missing information, rather than conditionally approving the application or requesting that information at an earlier point in time, can only be understood as discriminatory and pretextual.

### G. The Board Applied Marlboro's Facially Discriminatory Zoning Ordinance

311. The Board's denial was also unlawful because it relied on application of Marlboro's facially discriminatory Ordinance. The Ordinance imposes use restrictions and development standards on houses of worship that are more burdensome than those for comparable secular uses.

312. There are no districts in Marlboro where houses of worship are allowed as of right. In contrast, for example, the Ordinance declares the "right to operate a farm is a natural right" and is "a permitted use everywhere in the Township, regardless of zoning designations and regardless of whether specified as permitted uses therein." Code § 220-36C.

313. Houses of worship are a conditionally permitted use only in a limited number of zoning districts.

314. In some districts where comparable secular uses are permitted, houses of worship are not permitted at all. For example, lists of permitted uses in the C-3

Community Commercial District, the C-4 Community Commercial District, and the C-5 Community Commercial District II include “retail trade stores or shopping centers,” “service uses,” and “assembly halls, theaters, bowling alleys and other similar commercial recreational activity.” Code §§ 220-86A.(1)–(2), (5), -87A(1)–(2), (6), -87.1A. The districts’ lists of conditionally permitted uses includes “motels,” “drive-in restaurants,” and “amusement arcades.” Code §§ 220-86D(3)–(4), (6), -87D(3)–(4), (6), -87.1D. The lists of conditionally permitted uses in these districts do not include houses of worship.

315. In districts where houses of worship may be built, they must meet specific criteria and obtain conditional use permits, whereas comparable secular uses such as “assembly halls,” can be built as of right. For example, the CIR Commercial-Industrial-Research District’s list of permitted uses includes “assembly halls, theaters, bowling alleys and other similar commercial recreational activity.” Code § 220-88A(6). The IOR Industrial-Office-Research District’s list of permitted uses includes “assembly halls, theaters, bowling alleys and other similar commercial recreational activity.” Code § 220-89A(4). The LI Light Industrial Zone District’s list of permitted uses includes “assembly halls, theaters, bowling alleys, and other similar commercial recreational activities.” Code § 220-90A(10). In each of these districts, “churches and places of worship” are conditionally permitted. Code §§ 220-88C(4), 220-89C(3), 220-90D(2).

316. Furthermore, where houses of worship may be built, they are subject to stricter landscaped buffer, lot area, and setback requirements than comparable secular uses.

317. Landscaped Buffers: The Ordinance requires houses of worship within residential zoning districts to provide "a thirty-five-foot landscaped buffer to any existing residential use or zone in accordance with the design standards of the Township of Marlboro." Code § 220-105A(8). The Ordinance does not require other comparable secular uses in residential zoning districts to provide 35-foot landscaped buffers. For example, hospitals, philanthropic, or "eleemosynary" uses (such as "[f]raternal, social, civic, recreational," and "rehabilitative" buildings) do not require a 35-foot landscaped buffer to adjacent residential uses. Code § 220-107. "Quasi-public buildings and recreation areas," "including clubhouses," likewise do not need 35-foot landscaped buffers; instead, they require only that a "ten-foot-wide buffer strip, suitably landscaped, shall be provided along the side and rear property lines and shall adhere to the standards set forth in § 220-100." Code § 220-112E.

318. Lot Area: The minimum lot area requirement for houses of worship is 3.5 acres. Code § 220-105A(1). In contrast, the minimum lot area requirement for quasi-public buildings and recreation areas is 2 acres. Code § 220-112B.

319. Minimum Setbacks: The minimum building setback requirement for houses of worship is 50 feet. Code § 220-105A(1). The minimum building setback

requirement for quasi-public buildings and recreation areas is 30 feet. Code § 220-112B.

320. Because the Ordinance on its face discriminates against houses of worship and subjects them to unequal treatment compared to secular uses, the Ordinance is unlawful and should not have served as a basis for denying Tahir's Application.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of RLUIPA – Substantial Burden: 42 U.S.C. § 2000cc(a)(1)

321. Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if set forth fully herein.

322. 42 U.S.C. § 2000cc(a)(1) states:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution— (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

323. Defendants' Ordinance and their application of the Ordinance to Plaintiffs' proposed mosque constitute land use regulations under RLUIPA.

324. RLUIPA defines "religious exercise" as "any exercise of religion," including the "use, building, or conversion of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc–5(7)(A)–(B).

325. A mosque plays a central role in Islamic religious exercise. Congregants engaging in daily prayer, communal worship, and religious observance constitute "religious exercise."

326. "[A] land use regulation—even one of general applicability—imposes a substantial burden if it limits the *use* of real property that is otherwise available for the proposed exercise of religion so as to prevent the proposed exercise of religion on the property." *Anash, Inc. v. Borough of Kingston*, 184 F.4th 214, 239–40 (3d Cir. 2026).

327. The Ordinance and the denial of Tahir's Application impose a substantial burden on Plaintiffs' religious exercise by depriving Plaintiffs of the ability to develop and use the Property as a house of worship.

328. Because there is no mosque in Marlboro, the denial of the Application means that Plaintiffs have no place in the Township to practice the essential tenets of their faith, which likewise constitutes a substantial burden on their religious exercise.

329. Once an applicant demonstrates that the regulation imposes a substantial burden, the burden of proof shifts to the Defendants, and the Defendants

must demonstrate that there is a compelling governmental interest and the regulation is the least restrictive means of furthering that interest.

330. Defendants did not and cannot identify any compelling governmental interests justifying the denial of the Application, which impedes Plaintiffs' religious exercise.

331. Even if Defendants had a compelling government interest, they cannot demonstrate that denial of Tahir's Application is the least restrictive means of furthering that interest.

332. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

## **COUNT II**

### **Violation of RLUIPA – Equal Terms: 42 U.S.C. § 2000cc(b)(1)**

333. Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if set forth fully herein.

334. 42 U.S.C. § 2000cc(b)(1) states: "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."

335. A land use regulation violates this provision if it treats religious institutions worse than "a better-treated secular comparator that is similarly situated in regard to the objectives of the challenged regulation." *Lighthouse Inst. for*

*Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 268 (3d Cir. 2007) (emphasis omitted).

336. In administering and enforcing Defendants' Ordinance, and denying the Application, Defendants treated Plaintiffs and their proposed mosque on less than equal terms than similarly situated nonreligious assemblies and institutions.

337. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

**COUNT III**

**Violation of RLUIPA – Nondiscrimination 42 U.S.C. § 2000cc(b)(2)**

338. Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if set forth fully herein.

339. 42 U.S.C. § 2000cc(b)(2) states: "No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination."

340. This provision prohibits "governmental bodies from treating groups differently on the basis of their religious denomination." *United States v. Bensalem Twp.*, 220 F. Supp. 3d 615, 622 (E.D. Pa. 2016). This includes "disparate treatment in the implementation of zoning regulations." *Id.*

341. Defendants discriminated against Plaintiffs on the basis of religion and their religious denomination in the implementation of Marlboro's Ordinance and in denying Tahir's Application to build a mosque.

342. The Ordinance also facially discriminates against assemblies on the basis of religion. Houses of worship are only a conditionally permitted use and may be built and operated only in certain zoning districts. In certain zoning districts where secular assemblies are permitted as of right, houses of worship are not permitted at all. In certain zoning districts where houses of worship are conditionally permitted, they must satisfy stricter requirements than secular assemblies.

343. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

**COUNT IV**

**Violation of RLUIPA – Exclusion and Limits 42 U.S.C. § 2000cc(b)(3)(B)**

344. Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if set forth fully herein.

345. 42 U.S.C. § 2000cc(b)(3)(B) states: "No government shall impose or implement a land use regulation that . . . unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." The purpose of this provision is to "prevent municipalities from broadly limiting where religious entities can locate."

*Adhi Parasakthi Charitable, Med., Educ., & Cultural Soc'y of N. Am. v. Twp. of W. Pikeland*, 721 F. Supp. 2d 361, 387 (E.D. Pa. 2010).

346. The Ordinance facially discriminates against assemblies on the basis of religion and unreasonably limits religious assemblies, institutions, and structures within Marlboro.

347. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

## COUNT V

### Violation of the First Amendment of the United States Constitution – Free Exercise Clause 42 U.S.C. § 1983

348. Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if set forth fully herein.

349. 42 U.S.C. § 1983 states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

350. Defendants are persons within the meaning of 42 U.S.C. § 1983.

351. Plaintiffs are persons within the meaning of 42 U.S.C. § 1983.

352. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

353. Defendants acted under color of state law to deny Plaintiffs' constitutional rights.

354. The Free Exercise Clause of the First Amendment to the Constitution provides "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amd. I, cl. 2. The Clause prohibits the government from imposing "special disabilities on the basis of religious views or religious status." *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 877 (1990). It forbids "[o]fficial action that targets religious conduct for distinctive treatment." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 534 (1993).

355. Government action impacting religious practice must "satisfy strict scrutiny if it permits individualized, discretionary exemptions." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004).

356. The Ordinance and the Board's Resolution have imposed "special disabilities on the basis of" Plaintiffs' "religious views [and] religious status." *Smith*, 494 U.S. at 877.

357. The individualized application of the Ordinance embodied by the Board's Resolution cannot satisfy strict scrutiny. Denying the Application to build a mosque serves no compelling government interest. Even if it can be said to serve such an interest, outright denial of the Application is not narrowly tailored.

358. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

## COUNT VI

### Violation of the United States Constitution – Free Exercise Clause 42 U.S.C. § 1983 (Facially Unconstitutional Ordinance)

359. Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if set forth fully herein.

360. "[T]he minimum requirement" of religious "neutrality is that a law not discriminate on its face." *Lukumi*, 508 U.S. at 533. A law that is not neutral and generally applicable with respect to religion "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Id.* at 531–32.

361. The Ordinance facially discriminates against assemblies on the basis of religion. The Ordinance's restrictions on houses of worship cannot be justified by a compelling governmental interest. Even if they can be said to advance such an interest, the Ordinance's restrictions on houses of worship are not narrowly tailored to advance that interest.

362. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

## COUNT VII

### Violation of the Fourteenth Amendment of the United States Constitution – Equal Protection Clause 42 U.S.C. § 1983

363. Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if set forth fully herein.

364. The Fourteenth Amendment of the United States Constitution states, in pertinent part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . nor deny to any person within its jurisdiction the equal protection of the laws."

365. An equal protection claim requires proving "the existence of purposeful discrimination." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 273 (3d Cir. 2014). Plaintiffs "must demonstrate that they received different treatment from that received by other individuals similarly situated." *Id.* (citation modified).

366. Defendants have purposefully discriminated against Plaintiffs, and denied them their right to equal protection of the laws, on the basis of their religion by denying the Application and treating the proposed mosque differently and less favorably than similarly situated houses of worship and secular institutions.

367. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

**COUNT VIII**

**Violation of the New Jersey Constitution – Equal Protection N.J. Stat. Ann. § 10:6-2**

368. Plaintiffs repeat and reallege each allegation in the preceding paragraphs as if set forth fully herein.

369. Article I, Paragraph 1 of the New Jersey Constitution provides: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

370. This provision "like the fourteenth amendment, seeks to protect against injustice and against the unequal treatment of those who should be treated alike." *Greenberg v. Kimmelman*, 494 A.2d 294, 302 (N.J. 1985).

371. Defendants have deprived Plaintiffs of their right to equal protection of the laws and discriminated against them on the basis of their religion by treating the proposed mosque differently and less favorably than similarly situated houses of worship and secular institutions.

372. Plaintiffs have suffered damages as a result of Defendants' illegal actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Mohammad Tahir and Muslim Center of New Jersey respectfully request that this Court enter judgment in their favor and against Defendants Township of Marlboro Zoning Board of Adjustment, the Township of Marlboro, New Jersey, and the Mayor and Council of the Township of Marlboro, granting the following relief:

a) A declaration that the Board's Resolution denying Tahir's Application for preliminary and final major site plan approval, a d(3) conditional use variance, and a bulk variance violates the Substantial Burden, Equal Terms, and Nondiscrimination Provisions of RLUIPA, 42 U.S.C. §§ 2000cc(a)(1), (b)(1), (b)(2), and is therefore null and void;

b) A declaration that Marlboro's Ordinance treats houses of worship worse than comparable secular assemblies and institutions, in violation of RLUIPA's Nondiscrimination and Exclusions and Limits provisions, 42 U.S.C. §§ 2000(b)(2), (b)(3)(B), and the Free Exercise Clause of the First Amendment, and is therefore null and void.

c) A declaration that the Board's Resolution violates the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, as applied through 42 U.S.C. § 1983,

as well as the right to equal protection as guaranteed by the New Jersey Constitution, and is therefore null and void;

d) A permanent injunction enjoining Defendants from enforcing the Resolution and enjoining Defendants from preventing Plaintiffs from constructing a mosque on the Property;

e) A permanent injunction directing the Board to grant the Application for preliminary and final major site plan approval, the requested d(3) conditional use variance, and the requested bulk variance, subject only to the conditions to which Tahir already agreed since the filing of the Application on September 17, 2021 and the final hearing on June 23, 2026, and Plaintiffs coordinating with Monmouth County to obtain approval for a left-turn lane or other traffic arrangement related to entry to the Property;

f) An award of compensatory damages against Defendants in an amount to be determined at trial for the injuries Plaintiffs have sustained as a result of Defendants' violations of RLUIPA, the First and Fourteenth Amendments of the U.S. Constitution, and the New Jersey Constitution, including but not limited to damages for the prolonged deprivation of a permanent place of worship, Plaintiffs' inability to freely exercise their religion, the costs incurred during the almost five-year pendency of the Application, and emotional distress;

g) An award of nominal and/or punitive damages to the extent available under any count of this Complaint;

h) An award of Plaintiffs' reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) and any other applicable statute;

i) Pre-judgment and post-judgment interest as permitted by law; and

j) Such other and further relief as this Court deems just and proper.

## LOCAL CIVIL RULE 11.2 CERTIFICATION

The undersigned attorneys for Plaintiffs certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding and that no such action, arbitration or administrative proceeding is contemplated at this time. Out of an abundance of caution, Plaintiffs further certify that in October 2025 Plaintiff Tahir filed a state court action challenging Defendant Board's then-failure to act on the Application and seeking automatic approval of the Application, captioned *Mohammad Tahir v. Township of Marlboro Zoning Board of Adjustment et al.*, No. MON-L-003846-25 (N.J. Super., October 24, 2025). That action named as defendants the Township of Marlboro Zoning Board of Adjustment and Susan A. Branagan, in her official capacity as Municipal Clerk. The action was remanded to the Defendant Board in March 2026 pursuant to a Consent Order, directing the Board to render a decision on the Application. The Board has since rendered a decision on the Application and certified its compliance with the Consent Order in the state court. As of writing, the state court action has not been closed.

DATED: September 28, 2026

Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**

*/s/ Anand Agneshwar*
Anand Agneshwar (#283012018)
Jennifer R. Kwapisz* (#080682013)
Lee M. Cortes, Jr. (#041992009)
Kristine Rose Itliong*
Nathaniel D. Berman (#560372025)
Anish H. Vaidya*
250 West 55th St.
New York, NY 10019
T: (212) 836-8000
F: (212) 836-8689
anand.agneshwar@arnoldporter.com
jennifer.kwapisz@arnoldporter.com
lee.cortes@arnoldporter.com
kristine.itliong@arnoldporter.com
nathaniel.berman@arnoldporter.com
anish.vaidya@arnoldporter.com

**THE LAW FIRM OF OMAR T. MOHAMMEDI, LLC**

*/s/ Ahsen S. Janjua*
Omar T. Mohammedi*
Ahsen S. Janjua (#015902010)
233 Broadway, Ste. 820
New York, NY 10279
T: (212) 725-3846
OMohammedi@otmlaw.com
ajanjua@otmlaw.com
ahsen@lawasj.com

**ASIAN AMERICAN LEGAL DEFENSE & EDUCATION FUND**

*/s/ Ronak Patel*
Ronak Patel*
Helen Anne Schutz Lo*
Niji Jain*
Jane Shim*
T: (212) 966-5932
99 Hudson Street, 12th Floor
New York, NY
rpatel@aaldef.org
alo@aaldef.org
njain@aaldef.org
jshim@aaldef.org

*Counsel for Plaintiffs*

*Application for admission or *pro hac vice* admission forthcoming.

## VERIFICATION

I, Mohammad Tahir, pursuant to 28 U.S.C. § 1746, verify as follows:

1. I am over 18 years of age.

2. I am a named plaintiff in this case and the President of plaintiff the Muslim Center of New Jersey, d/b/a Marlboro Muslim Center.

3. I make this verification on my own behalf and on behalf of the Muslim Center of New Jersey.

4. I have personal knowledge of the facts in this verification.

5. I have reviewed the factual allegations in the Complaint and have personal knowledge of the facts stated therein. The facts stated therein are true and correct to the best of my knowledge, information, and belief.

6. I verify under penalty of perjury that the foregoing is true and correct.

Executed on September __27__, 2026 in Morganville, New Jersey.

Mohammad Tahir